# EXHIBIT 1

ER

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK ss.                                           C.A. NO.

|  |  |
|---|---|
| LISA J. FALL,                              ) | |
| )  | |
|      Plaintiff,                          ) | |
| )  | PLAINTIFF'S COMPLAINT |
| v.                                              ) | AND DEMAND FOR JURY TRIAL |
| )  | |
| DAVID M. BATTAN, and         ) | |
| ALAN P.W. KONEVSKY            ) | |
| )  | |
|      Defendants.                       ) | |

**<u>INTRODUCTION</u>**

This action arises from the Plaintiff, Lisa J. Fall's ("<u>Ms. Fall</u>") employment with Boston Security Token Exchange LLC ("<u>BSTX</u>").  The Defendants deprived Ms. Fall of her earned wages under the Massachusetts Wage Act, Mass. Gen. Laws Chapter 149 (the "<u>Wage Act</u>").  Ms. Fall seeks to recover unpaid salary, bonus pay, vacation pay, mandatory treble damages, interest, costs, and attorneys' fees.  At relevant times, the Defendants David M. Battan and Alan P.W. Konevsky controlled, directed, and participated to a substantial degree in formulating and determining the policy of BSTX, and are therefore deemed to be employers for purposes of the Wage Act, and are personally liable to Ms. Fall.

**<u>PARTIES</u>**

1.      Plaintiff, Lisa J. Fall ("<u>Ms. Fall</u>" or "<u>Plaintiff</u>"), is an individual residing in Wenham, Massachusetts.  Ms. Fall maintains a usual place of business at 101 Arch Street in Boston, MA.

1

2.      Defendant, Mr. David M. Battan ("Mr. Battan"), was at relevant times the Executive Chair of the Board of Directors of BSTX (the "Board") and, upon information and belief, a member of the Compensation Committee of BSTX (the "Compensation Committee"). Mr. Battan is an individual residing at 5400 Wehawken Road, Bethesda, Maryland 20816.

3.      Defendant, Mr. Alan P.W. Konevsky ("Mr. Konevsky"), was at all relevant times a member of the Board and a member of the Compensation Committee.  Mr. Konevsky is an individual residing at 710 Heights Lane, Tenafly, New Jersey 07670.

## JURISDICTION AND VENUE

4.      This Court has personal jurisdiction over the defendants pursuant to G.L. c. 223A, § 3 because they transacted business in the Commonwealth, entered into contracts in the Commonwealth, and were controlling parties of a limited liability company which has its principal place of business in, and conducts business in, the Commonwealth.

5.      This Court has subject matter jurisdiction over this action pursuant to G.L. c. 212, § 3.

6.      Venue is appropriate in Suffolk County pursuant to G.L. c. 223, § 1.

## FACTS

7.      Ms. Fall was employed by BSTX as its Chief Executive Officer from June 16, 2018 to December 1, 2022.  Ms. Fall was an employee in good standing at all times throughout her employment with BSTX, through and including her voluntary resignation.  Ms. Fall resigned due to BSTX's many contractual breaches, as further discussed below.

8.     BSTX executed an Assignment for the Benefit of Creditors on March 31, 2023.  Upon information and belief, it ceased operations at around that time.  Upon information and belief, the assignee under the Assignment for the Benefit of Creditors has now converted all assets of BSTX into money, for distribution to the creditors of BSTX.

_Employment Agreement – Unpaid Salary, Bonus, Vacation Time and Severance Pay_

9.     Ms. Fall and BSTX are parties to an Employment Agreement dated October 4, 2019 (the "Employment Agreement"), a copy of which is appended hereto as Exhibit A.

10.     _Unpaid Salary_.  Section 4(a) of the Employment Agreement sets forth the salary to which Ms. Fall was entitled.  At all relevant times, Ms. Fall's salary was $1,000,000 per annum, pursuant to Section 4(a)(i) of the Employment Agreement.  BSTX failed and refused to pay Ms. Fall all of the salary which she has earned.  This includes but is not limited to $1,000,000 of salary which Ms. Fall earned but which BSTX wrongfully deferred and has still failed to pay to Ms. Fall.  This also includes approximately $3,788 which Ms. Fall earned during the final period of her employment, which BSTX failed to pay her.

11.     _Unpaid Bonus_.  Section 4(b) of the Employment Agreement sets forth the bonus payments to which Ms. Fall was entitled.  Ms. Fall earned a bonus pursuant to Section 4(b)(i) which BSTX paid to her.  Ms. Fall also earned a bonus pursuant to Section 4(b)(ii), in the amount of $250,000, which BSTX failed and refused to pay her.

12.     _Unpaid Vacation Time_.  Section 5(b) of the Employment Agreement sets forth Ms. Fall's entitlement to earn vacation time.  As of her final day of employment, Ms. Fall had

3

earned thirty-four (34) days of accrued vacation time.  The value of said earned wages is approximately $130,749.  BSXT failed and refused to pay Ms. Fall said earned wages.

13.      *Unpaid Severance Pay*.  Section 6 of the Employment Agreement establishes that in the event of Ms. Fall's termination of employment for Good Reason (as defined in Section 6 of the Employment Agreement), then BSTX was required to pay Ms. Fall her salary for eighteen (18) months after her employment terminated.  The Employment Agreement established several conditions each of which standing alone constituted "Good Reason."  One such condition is "any other action or inaction that constitutes a material breach by BSTX of this Agreement."  BSTX's failure to pay Ms. Fall her salary and other amounts due to her pursuant to the Agreement constitutes such Good Reason.

14.      On or about October 16, 2022, Ms. Fall provided BSTX with written notice of BSTX's breach of the Employment Agreement, and confirmed that BSTX had thirty (30) days to cure such breach.  (See Exhibit B.)  On or about October 17, 2022, for the sake of clarity, Ms. Fall confirmed that there existed a condition for Good Reason termination of employment, pursuant to Section 6 of the Employment Agreement.  (See Exhibit C.)

15.      BSTX failed to cure its breach of the Employment Agreement, either within the contractually-established timeframe, or at any other time.  Ms. Fall resigned from employment due to such Good Reason, effective December 1, 2022.

16.      BSTX was required, pursuant to the Employment Agreement, to pay Ms. Fall $1,500,000, representing her salary for eighteen (18) months of employment, however it failed and refused to do so.

*Deferral and Equity Grant Agreement, and Lisa Fall Promissory Note*

17.    Ms. Fall and BSTX are parties to a Deferral and Equity Grant Agreement dated October 15, 2021 ("Deferred Compensation Agreement"), a copy of which is appended hereto as Exhibit D.  Pursuant to the Deferred Compensation Agreement, Ms. Fall agreed to defer her receipt of salary and other moneys due to her pursuant to the Employment Agreement until October 15, 2022 (the "Payment Deadline").  Contracts to defer earned wages are unenforceable and unlawful in Massachusetts.

18.    In connection with the Deferred Compensation Agreement, BSTX executed a certain Promissory Note in favor of Ms. Fall dated October 15, 2021 (the "Lisa Fall Promissory Note"), a copy of which is appended hereto as Exhibit E.

19.    The Payment Deadline has long passed, and BSTX failed and refused to pay Ms. Fall the amounts that are the subject of the Deferred Compensation Agreement and the Lisa Fall Promissory Note.

20.    On or about October 16, 2022, Ms. Fall provided BSTX with written notice to BSTX of its breach of the Deferred Compensation Agreement, and default of the Lisa Fall Promissory Note.  (See Exhibit B.)  BSTX failed and refused to remedy such breach and default.

*Individual Liability*

21.    At relevant times, Messrs. Battan and Konevsky have controlled, directed, and participated to a substantial degree in formulating and determining the policy of BSTX.

22.    At relevant times, Messrs. Battan and Konevsky have served on the BSTX Board.

23.    At relevant times, Messrs. Battan and Konevsky have served on the Compensation Committee.  The Compensation Committee is charged with determining,

developing and implementing the compensation policies of BSTX.  Ms. Fall's compensation arrangements and decisions regarding payment of wages and other amounts due to her by BSTX were at all times controlled by the Compensation Committee.

24.     At relevant times, Messrs. Battan and Konevsky had Ms. Fall in their service and are personally liable for violations of the Wage Act.

25.     Mr. Konevsky voted in favor of the Deferred Compensation Agreement, pursuant to which payment of Ms. Fall's wages was delayed.  (Mr. Battan was not then on the Board or Compensation Committee.)  He voted in such manner even though contracts to defer earned wages are unenforceable and unlawful in Massachusetts.  The Deferred Compensation Agreement was breached, and Ms. Fall has never been paid amounts due to her thereunder.

26.     Mr. Battan joined the Board on April 12, 2022.  Upon information and belief, Mr. Battan joined the Compensation Committee on or around the same day.

27.     On at least five (5) separate occasions between March 2022 and August  2022, the BSTX Board voted in favor of borrowing money from BOX Holdings Group, LLC.  These transactions were deliberately and expressly structured to prevent Ms. Fall from receiving payment for overdue wages earned by her.  Specifically, promissory notes dated March 10, 2022, May 5, 2022, May 16, 2022, July 28, 2022 and August 30, 2022 (the "BOX Holdings Notes") stated:

> Use of Proceeds.  [BSTX] shall not use the proceeds of this Note to make cash payments to Lisa Fall.

(See Section 4(d) of the accompanying BOX Holdings Promissory Notes, all of which are attached hereto as Exhibits F through J.)

28.     Mr. Konevsky voted in favor of all of the BOX Holdings Promissory Note transactions.  Upon information and believe, Mr. Battan voted in favor of at least four (4) of the

BOX Holdings Promissory Note transactions.  Mr. Battan executed four (4) of the BOX

Holdings Promissory Notes on behalf of BSTX.

*Ms. Fall Has Satisfied the Administrative Filing Requirement*

29.     On October 4, 2023, Ms. Fall filed a Complaint with the Office of the Attorney

General of the Commonwealth of Massachusetts (the "Attorney General's Office"), seeking

payment of all earned wages.  By letters dated October 5, 2023, the Attorney General's Office

notified Ms. Fall by written correspondence, of her right to file private civil actions against

Messrs. Battan and Konevsky in this matter. (See Exhibits K-L.)

## COUNT I
## VIOLATION OF G.L. c. 149 § 148
### (Ms. Fall v. Messrs. Battan and Konevsky, individually)

30.     The Plaintiff hereby restates and incorporates each paragraph of this Complaint as

if fully stated herein.

31.     The Defendants, Messrs. Battan and Konevsky, had at all relevant times

management of BSTX for purposes of the Wage Act.

32.     The failure of the Defendants Messrs. Battan and Konevsky to timely pay Ms.

Fall her earned wages is a violation of the Wage Act, specifically Mass. G.L. c. 149 § 148.

33.     Pursuant to the G.L. c. 149 § 148, the Defendants Messrs. Battan and Konevsky

were required to pay their employees any and all earned wages when earned and for the last pay

period, on the date of termination.  All amounts which are the subject of this Complaint have

been definitely determined and have become due and payable to Ms. Fall.

34.    A violation of the Wage Act will also result in a mandatory trebling of the unpaid wages, as well as interest, costs, and attorneys' fees.

35.    As a result of the actions of the Defendants Messrs. Battan and Konevsky as detailed herein, Ms. Fall has been deprived of her wages and has suffered financial losses which entitle her to treble damages, costs and attorneys' fees.

**WHEREFORE**, the Plaintiff, Lisa J. Fall, prays that this Honorable Court award a judgment in her favor and against the Defendants, for the following relief:

1. Compensatory and consequential damages, including but not limited to:

    a. Deferred Salary equal to $1,000,000;

    b. Unpaid final salary equal to approximately $3,788;

    c. Unpaid bonus equal to $250,000; and

    d. Unpaid vacation pay equal to approximately $130,749;

2. Mandatory treble or multiple damages pursuant to G.L. c.149 §§ 148, 150;

3. Costs and expenses of this action;

4. Attorneys' fees;

5. Prejudgment and post-judgment interest; and

6. Such further relief as the Court deems fair and just.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury on every claim so triable.

Respectfully submitted,

LISA J. FALL,

By her attorneys,


Dated:  April 8, 2024                    /s/ Charles P. Kindregan
                                          Charles P Kindregan (BBO# 554947)
                                           ckindregan@beaconlawgroup.com
                                          Elizabeth Adler (BBO# 557955)
                                           eadler@beaconlawgroup.com
                                          Beacon Law Group, LLC
                                          100 Cambridge St., 14th Floor
                                          Boston, MA 02114
                                          (617) 235-8600

# EXHIBIT A

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "***Agreement***"), entered into as of October 4, 2019 (the "***Effective Date***") is by and between Lisa J. Fall (the "***Executive***") and Boston Security Token Exchange LLC ("***BSTX***" and, together with the Executive, the "***Parties***").

WHEREAS, BSTX desires to employ Executive, and Executive desires to be employed by BSTX, as the Chief Executive Officer of BSTX ("***CEO***"); and

WHEREAS, BSTX believes that Executive's service, experience and knowledge are valuable to BSTX in connection with its business;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties hereto agree as follows:

1.    **Employment**.   BSTX hereby employs Executive and Executive accepts such continued employment upon the terms and conditions hereinafter set forth.

2.    **Term of Employment**.   Executive's continued employment shall be governed by this Agreement (including without limitation the provisions of Section 6) on an "at-will" basis, without a fixed term, and may be terminated by BSTX or Executive at any time, with or without notice, for any reason or no reason (and no reason need be given) by written notice to the other party.  The period beginning on the Effective Date and continuing throughout the time Executive is employed by BSTX is referred to herein as the "***Employment Period***."

3.    **Duties; Extent of Service**.   During Executive's employment under this Agreement, Executive:

(a)    shall serve as an employee of BSTX with the title and position of Chief Executive Officer, reporting to the Board of Directors of BSTX (the "***Board***");

(b)    shall have the responsibilities, powers and authority of a CEO, including general administration powers, the authority to make employment decisions regarding employment of employees and third-party service providers and to allocate compensation, including equity grants from the pool approved by the Board;

(c)    shall render services reasonably incident to the foregoing.  Executive hereby agrees to serve BSTX in the capacity indicated, and agrees to devote the necessary time, attention, skill and energies to, the advancement of the interests of BSTX and the performance of Executive's duties and responsibilities hereunder.  BSTX and Executive acknowledge and agree that Executive is and will continue to be employed by other entities, subject to Section 6(a)(i) below, and, notwithstanding anything in this Agreement to the contrary, the parties hereto acknowledge and agree that any service by Executive as a director, officer, employee or agent of BOX Exchange LLC (the "***Exchange***"), and any action of Executive in connection therewith, is encouraged and permitted by BSTX and shall not constitute a breach or violation of this Agreement.

4.      **Compensation**.  Executive shall receive the following compensation:

(a)      **Salary**.  During Executive's employment under this Agreement, BSTX shall pay Executive a salary (the "*Salary*"), which shall be subject to withholding under applicable law, shall be prorated for partial years and shall be payable in periodic installments and reviewed for increases (but not decreases) from time to time, at the rate of:

(i)      $1,000,000 per annum, beginning on the Effective Date;

(ii)      $1,500,000 per annum, beginning on the first date when ten (10) tokens from ten (10) distinct issuers are listed and tradable on BSTX; and

(iii)      re-evaluated by the Parties for increase to approximately $2,000,000 when BSTX reaches breakeven.

(b)      **Bonus Payments**.  Executive shall receive the following cash bonus payments:

(i)      $500,000 upon execution of this Agreement;

(ii)      $250,000 upon approval of BSTX, by the United States Securities and Exchange Commission, to operate a securities market as a facility of a national securities exchange;

(iii)      $250,000 upon the first trade of any security tokens (other than a security token issued by Overstock.com, Inc. or tZERO Group, Inc.) on BSTX; and

(iv)      Any other discretionary bonuses as may be determined by the Compensation Committee of the Board from time to time, in its sole discretion.

(c)      **Equity**.  Executive shall receive BSTX non-voting equity interests equal to four percent (4%) of the fully-diluted equity of BSTX, subject to a three-year vesting schedule.

5.      **Benefits**

(a)      **Regular Benefits.**  During Executive's employment under this Agreement, Executive shall be entitled to participate in any and all medical, dental and life insurance plans and disability income plans, retirement arrangements and other employment benefits as in effect from time to time for executive officers of BSTX generally.  Such participation shall be subject to (i) the terms of the applicable plan documents (including, as applicable, provisions granting discretion to the Board or any administrative or other committee provided for therein or contemplated thereby) and (ii) generally applicable policies of BSTX.

(b)      **Vacation**.  During Executive's employment under this Agreement, Executive shall receive paid vacation annually in accordance with BSTX's practices for executive officers, as in effect from time to time, but in any event not less than six (6) weeks per calendar year.

(c)     **Expenses**.  BSTX shall reimburse Executive for all reasonable business expenses incurred by Executive during Executive's employment hereunder to the extent in compliance with BSTX's business expense reimbursement policies in effect from time to time and upon presentation by Executive of such documentation and records as BSTX shall from time to time require.  BSTX shall reimburse, as a business expense, Executive's legal fees incurred in connection with negotiating the terms of this Agreement and Executive's cell phone and parking expenses.  All expense reimbursements shall be made in accordance with Section 7(c), below.

(d)     **Taxation of Payments and Benefits**.  BSTX shall undertake to make deductions, withholdings and tax reports with respect to payments and benefits under this Agreement to the extent that it reasonably and in good faith believes that it is required to make such deductions, withholdings and tax reports.  Payments under this Agreement shall be in amounts net of any such deductions or withholdings.  Nothing in this Agreement shall be construed to require BSTX to make any payments to compensate Executive for any adverse tax effect associated with any payments or benefits or for any deduction or withholding from any payment or benefit.

(e)     **Exclusivity of Compensation and Benefits**.  Executive shall not be entitled to any payments or benefits from BSTX other than those provided under this Agreement. Compliance with the provisions of this Section 5 shall in no way create or be deemed to create any obligation, express or implied, on the part of BSTX with respect to the continuation of any particular benefit or other plan or arrangement maintained by BSTX as of or prior to the Effective Date or the creation and maintenance of any particular benefit or other plan or arrangement at any time after the Effective Date.

6.     **Non-Competition, Non-Solicitation; Confidentiality; Proprietary Rights; Change in Control**.  Executive's obligations under this Section 6 hereof shall survive any termination of Executive's employment with BSTX at any time and for any reason.   As consideration for the covenants provided by Executive under this Section 6, BSTX agrees that if it terminates Executive's employment without *Cause* (as defined below) or if Executive terminates Executive's employment for ***Good Reason*** (as defined below) or if BSTX seeks to enforce the Non-Competition Agreement set forth in Section 6(a) below, BSTX shall pay to Executive (A) unless payment is made pursuant to paragraph 6(h) below, payable on BSTX's regular payroll basis, the Executive's then current Salary as of the time of termination, continuing for eighteen (18) months after Executive's termination of employment.

"*Cause*" shall mean any of the following, provided, however, that Cause shall not arise out of any of the Executive's service to the Exchange:

(A)     any material failure by Executive to perform Executive's duties and responsibilities under this Agreement (other than by reason of Executive's death or disability) or any material violation of any law, rule, regulation or guideline imposed by a regulatory body having jurisdiction over BSTX or Executive, as determined after investigation by the Board, *provided* that, unless the Board determines that such failure or violation is not capable of cure, Executive, after having been given written notice by the Board, shall have seven (7) days to

3

demonstrate to the satisfaction of the Board that Executive has been able to cure such failure or violation;

(B)     any willful or grossly negligent act of fraud, embezzlement, theft, misappropriation of funds by Executive, as determined after investigation by the Board, or Executive's admission to, conviction of or plea of guilty or *nolo contendere* to a felony or any other crime involving fraud, embezzlement, theft, or misrepresentation or which the Board reasonably believes has had or will have a material detrimental effect on BSTX's reputation or business;

(C)     any gross negligence or willful misconduct of Executive which could reasonably be expected to result in a material financial loss or liability to BSTX, or material damage to the reputation of BSTX, as determined after investigation by the Board; or

(D)     any other action or inaction that constitutes a material breach by Executive of this Agreement.

"***Good Reason***" shall mean any of the following:

(A)     a material diminution in Executive's title;

(B)     an imposition of a requirement that Executive report to a corporate officer or employee other than the Board;

(C)     a change in the location of the primary office at which Executive must perform the services to a location outside the Boston, Massachusetts metropolitan area, disregarding for this purpose ordinary business travel; or

(D)     any other action or inaction that constitutes a material breach by BSTX of this Agreement.

*provided*, that any termination of employment for Good Reason may only occur not later than two years following the initial existence of one or more of the conditions listed in (A) through (D) of the definition of "Good Reason" above arising without the consent of Executive and, *provided*, *further*, that Executive must give written notice to BSTX that a condition for Good Reason termination of employment exists no later than 90 days after the initial existence of such condition and BSTX shall have a period of 30 days thereafter during which BSTX may cure the condition and, if so cured, any termination therefore by Executive shall not be for Good Reason and BSTX shall not be required to pay any amount pursuant to this <u>Section 6</u>.

(a)     **Noncompetition**.  Executive agrees that Executive shall not, during the Employment Period and for a period of one (1) year thereafter:

(i)     directly or indirectly (A) own, manage, operate, or control, or participate in the ownership, management, operation, or control of, (B) serve as a director, officer, partner, employee, agent, consultant, advisor or in any similar capacity, or (C) have any financial interest in, or aid or assist anyone else in the conduct of, any

4

person or enterprise that competes with any product line of or service offered by BSTX in the Territory (defined below) at the time of termination of Executive's employment with BSTX;

(ii)    call upon, solicit, direct, take away, provide products or services to, or attempt to call upon, solicit, direct, take away or provide products or services to, or accept any orders of business from any customers or clients of BSTX that are customers or clients of BSTX at the time of termination of Executive's employment with BSTX for products or services which are competitive with the products or services offered by BSTX in the Territory at the time of termination of Executive's employment with BSTX;

(iii)    solicit any employee of BSTX to terminate such employee's employment with BSTX, or hire or agree to hire any such employee of BSTX unless either BSTX consents or at least one (1) year has passed since the termination of such employee's employment with BSTX; or

(iv)    directly or indirectly request or advise any supplier, service provider or financial resource of BSTX that is a supplier, service provider or financial resource of BSTX at the time of termination of Executive's employment with BSTX to withdraw, curtail or cancel the furnishing of such supply, service or resource to BSTX.

As used herein, "*Territory*" means the United States of America.

Nothing in this <u>Section 6(a)</u> shall prohibit Executive from acquiring or holding not more than five percent of any class of publicly traded securities.

(b)    **Confidential Information**.    As used in this Agreement, the term "*Confidential Information*" shall mean information belonging to BSTX of value to BSTX, or with respect to which BSTX has the right to use in the course of conducting its business, the disclosure of which could result in a competitive or other disadvantage to BSTX. Confidential Information includes information, whether or not patentable or copyrightable, in written, oral, electronic or other tangible or intangible forms, stored in any medium, including, by way of example and without limitation, trade secrets, ideas, concepts, designs, configurations, specifications, drawings, diagrams, models, flow charts, processes, techniques, formulas, software, improvements, inventions, data, know-how, discoveries, copyrightable materials, marketing plans and strategies, sales and financial reports and forecasts, customer lists, studies, reports, records, books, contracts, instruments, business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) which have been discussed or considered by the management of BSTX. Confidential Information includes, without limitation, information developed by Executive in the course of Executive's employment by BSTX, as well as other information to which Executive may have access in connection with Executive's employment. Confidential Information also includes the confidential information of others with which BSTX has a business relationship known to BSTX as a result of such relationship. Notwithstanding the foregoing, Confidential Information does not include information in the public domain, unless due to breach of Executive's duties under <u>Section 6(c)</u>.

(c)    **Confidentiality**.  In the course of performing services hereunder on behalf of BSTX, Executive from time to time will have access to Confidential Information.  Executive agrees (i) to hold the Confidential Information in strict confidence, (ii) not to disclose the Confidential Information to any person (other than in the ordinary course of business of BSTX), and (iii) not to use, directly or indirectly, any of the Confidential Information for any purpose other than on behalf of, and for the benefit of, BSTX; *provided*, *however*, the restrictions contained herein shall not apply to the extent Executive is required by law to testify in a legislative, judicial or regulatory proceeding, or is otherwise required by law to disclose Confidential Information if Executive, promptly upon becoming aware of such requirement, delivers prior written notice to BSTX of such requirement and fully cooperates with BSTX in all of BSTX's lawful efforts to defend against such disclosure.  All documents, records, data, equipment and other physical property, whether or not pertaining to Confidential Information, that are furnished to Executive by BSTX or to the extent produced by Executive in connection with Executive's employment by BSTX will be and shall remain the sole property of BSTX as between BSTX and Executive.  Upon the termination of Executive's employment with BSTX for any reason and as and when otherwise requested by BSTX, all Confidential Information (including, without limitation, all data, memoranda, notes, programs and other papers and items, and reproductions thereof relating to the foregoing matters) in Executive's possession or control shall be immediately returned to BSTX.

(d)    **Third Party Agreements and Rights**.  The Parties hereby acknowledge that Executive is bound by the terms of agreements with other parties that restrict Executive's use or disclosure of information and Executive's engagement in certain businesses.  Executive represents to BSTX that Executive's execution of this Agreement, Executive's employment with BSTX and the performance of Executive's proposed duties for BSTX will not violate any obligations Executive may have to any other party.  In Executive's work for BSTX, Executive will not make use of any information in violation of any agreements with, or rights of, any such party.

(e)    **Litigation and Regulatory Cooperation**.  During and after Executive's employment, Executive shall cooperate fully with BSTX in the defense or prosecution of any claims or actions now in existence or which may be brought in the future against or on behalf of BSTX that relate to events or occurrences that transpired while Executive was employed by BSTX.  Executive's full cooperation in connection with such claims or actions shall include, but not be limited to, being available to meet with counsel to prepare for discovery or trial and to act as a witness on behalf of BSTX at mutually convenient times.  During and after Executive's employment, Executive also shall cooperate fully with BSTX in connection with any investigation or review of any federal, state or local regulatory authority as any such investigation or review relates to events or occurrences that transpired while Executive was employed by BSTX.  BSTX shall reimburse Executive for Executive's time and any reasonable out-of-pocket expenses incurred in connection with Executive's performance of obligations pursuant to this Section 6(e), in accordance with Section 7(c), below.

(f)    **Inventions**.  Executive recognizes that BSTX possesses a proprietary interest in all of the Confidential Information and has the exclusive right and privilege to use, protect by copyright, patent or trademark, or otherwise exploit the processes, ideas and concepts

6

described therein to the exclusion of Executive, except as otherwise agreed between BSTX and Executive in writing.

(g)     **Acknowledgment**.    Executive acknowledges that the provisions of this Section 6 are an integral part of Executive's employment arrangements with BSTX.  The parties agree and acknowledge that the duration, scope and geographic area of the covenants described in this Section 6 are fair, reasonable and necessary in order to protect the good will and other legitimate interests of BSTX and that adequate consideration has been received by Executive for such obligations.  If, however, for any reason any court of competent jurisdiction determines that the restrictions in this Section 6 are not reasonable, that consideration is inadequate or that Executive has been prevented unlawfully from earning a livelihood, such restrictions shall be interpreted, modified or rewritten to include as much of the duration, scope and geographic area identified in this Section 6 as will render such restrictions valid and enforceable.

(h)     **Change in Control**.  If Executive's employment terminates in connection with a Change in Control (as defined below), within three months prior to a Change in Control, or within twelve months after a Change in Control, Executive shall receive (i) Executive's full compensation based on the prior year's bonus and salary, continuing for two (2) years after Executive's termination of employment, payable on BSTX's regular payroll basis and (ii) full accelerated vesting of any equity or other award; *provided*, *however*, that in the event of such termination solely under clause (F) of the definition of Change in Control below, the time period set forth in Section 6(h)(i) above shall be reduced to one (1) year.   Notwithstanding the foregoing, if Executive voluntarily terminates Executive's employment prior to the Change in Control, no payment shall be made pursuant to this paragraph 6(h).

"***Change in Control***" shall mean any of the following events with respect to BSTX:

(A)     the sale, lease or transfer of a majority of the assets of BSTX;

(B)     the issuance, sale or transfer of voting securities of BSTX to a person in a transaction or series of transactions after which such person owns, directly or indirectly with its affiliates, in excess of 50% of the voting control of BSTX;

(C)     the sale, merger, consolidation, transfer, transaction or series of transactions or reorganization of BSTX in which the holders of BSTX's equity interests immediately prior to the transaction or related series of transactions hold less than a majority of the equity interests of the surviving entity;

(D)     a transaction, merger or consolidation of BSTX with or into another person or entity after which a majority of the ownership of the surviving entity is held, directly or indirectly, by a person, group or entity which did not hold a majority of the voting control of BSTX immediately prior to such transaction, merger or consolidation;

7

(E)     a liquidation or winding up of BSTX not solely as a result of the bankruptcy or insolvency of BSTX; or

(F)     a liquidation or winding up of BSTX solely as a result of the bankruptcy or insolvency of BSTX.

7.     **Section 409A**.

(a)     **Purpose**.  This section is intended to help ensure that compensation paid or delivered to Executive pursuant to this Agreement either is paid in compliance with, or is exempt from, Section 409A of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder ("***Section 409A***").  However, BSTX does not warrant to Executive that all compensation paid or delivered to Executive for Executive's services will be exempt from, or paid in compliance with, Section 409A.  Executive bears the entire risk of any adverse federal, state or local tax consequences and penalty taxes which may result from payment of compensation for Executive's services on a basis contrary to the provisions of Section 409A or comparable provisions of any applicable state or local income tax laws.

(b)     **Amounts Payable On Account of Termination**.  For the purposes of determining when amounts otherwise payable on account of Executive's termination of employment will be paid, "termination of employment" or words of similar import, as used in this Agreement, shall mean the date as of which BSTX and Executive reasonably anticipate that no further services will be performed by Executive and shall be construed as the date that Executive first incurs a "separation from service" for purposes of Section 409A on or following termination of employment.

(c)     **Reimbursements**.  Any taxable reimbursement of business or other expenses, or any provision of taxable in-kind benefits to Executive, as specified under this Agreement, shall be subject to the following conditions: (i) the expenses eligible for reimbursement or the amount of in-kind benefits provided in one taxable year shall not affect the expenses eligible for reimbursement or the amount of in-kind benefits provided in any other taxable year, except for any medical reimbursement arrangement providing for the reimbursement of expenses referred to in Section 105(b) of the Internal Revenue Code of 1986, as amended; (ii) the reimbursement of an eligible expense shall be made no later than the end of the year after the year in which such expense was incurred; and (iii) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit.

(d)     **Interpretative Rules**.  In applying Section 409A to compensation paid pursuant to this Agreement, any right to a series of installment payments under this Agreement shall be treated as a right to a series of separate payments.

8.     **Parties in Interest; Certain Remedies**.  It is specifically understood and agreed that this Agreement is intended to confer a benefit, directly or indirectly, on BSTX, that any breach of the provisions of this Agreement by Executive will result in irreparable injury to BSTX, and that the remedy at law alone will be an inadequate remedy for such breach. Accordingly, subject to <u>Section 9</u> hereof, Executive agrees that if Executive breaches, or

8

proposes to breach, any portion of this Agreement, BSTX shall be entitled, in addition to any other remedy it may have, to enforce the specific performance of this Agreement by Executive through both temporary and permanent injunctive relief without the necessity of posting a bond or proving actual damages and without limitation of its right to damages and any and all other remedies available to BSTX, it being understood that injunctive relief is in addition to, and not in lieu of, such other remedies.

9.      **Integration**.  This Agreement, together with any agreements referenced herein, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements between the parties with respect to any related subject matter.

10.      **Assignment; Successors and Assigns**.  Neither BSTX nor Executive may make any assignment of this Agreement or any interest herein without the prior written consent of the other party; provided that BSTX may assign its rights under this Agreement without the consent of Executive in the event that BSTX shall effect a reorganization, consolidate with or merge into any other corporation, partnership, organization or other entity, or transfer all or substantially all of its properties or assets to any other person, corporation, partnership, organization or other entity.  This Agreement shall inure to the benefit of and be binding upon BSTX and Executive, their respective successors, executors, administrators, heirs and permitted assigns.

11.      **Enforceability**.  If any portion or provision of this Agreement (including, without limitation, any portion or provision of any section of this Agreement) shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

12.      **Waiver**.  No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party.  The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

13.      **Notices**.  Any notices, requests, demands and other communications provided for by this Agreement shall be sufficient if in writing and delivered in person or sent by a nationally recognized overnight courier service or by registered or certified mail, postage prepaid, return receipt requested, to Executive at the last address Executive has filed in writing with BSTX or, in the case of BSTX, at 101 Arch Street, Suite 1940, Boston, MA 02110 or such other address as BSTX may provide by written notice to Executive.

14.      **Amendment**.  This Agreement may be amended or modified only by a written instrument signed by Executive and by a duly authorized representative of BSTX.

15.      **Governing Law**.  This Agreement shall be construed under, and be governed in all respects by, the laws of the Commonwealth of Massachusetts without giving effect to any state's conflict of laws principles.

16.     **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be taken to be an original and all of which taken together shall constitute one and the same document.

17.     **Certain Definitions**.  For purposes of this Agreement, the term "***person***" means an individual, corporation, limited liability company, partnership, entity, association, trust or any unincorporated organization.

18.     **Arbitration, Expenses and Fees**.  In the event that any party hereto has any claim hereunder, the party shall promptly notify the other party of such claim.  If, within 30 days after the receipt of such notice of claim, the parties cannot agree on a resolution of such claim, the parties agree to submit such dispute to binding arbitration under the employment rules of the American Arbitration Association.  Any such arbitration shall be conducted by three arbitrators, one of whom shall be selected by Executive or Executive's estate, one of whom shall be selected by BSTX, and one of whom shall be selected by the arbitrators so selected.  The expenses of any such arbitration shall be paid by the non-prevailing party, as determined by the final order of the arbitrators.  In the event that any action is brought to enforce any of the provisions of this Agreement, or to obtain money damages for the breach thereof, and such action results in the award of a judgment for money damages or in the granting of any injunction in favor of one of the parties to this Agreement, all expenses, including reasonable attorneys' fees, shall be paid by the non-prevailing party.

*     *     *

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date first set forth above.

BOSTON SECURITY TOKEN EXCHANGE LLC

By: _____

Susan E. Chamberlin
Chairman

EXECUTIVE:

_____

Lisa J. Fall

*[signature page to Employment Agreement]*

# EXHIBIT B

EX. B

October 16, 2022

Boston Security Token Exchange LLC
101 Arch St., suite 1940
Boston, MA 02110

**RE:  Lisa J. Fall/Boston Security Token Exchange LLC**

Dear Sir/Madam

Pursuant to section 6 of my Employment Agreement with Boston Security Token Exchange ("BSTX") dated October 4, 2019, I hereby provide you with notice that BSTX has breached that Employment Agreement.  Furthermore, this is also to provide you with notice that BSTX has breached the Deferral and Equity Grant Agreement dated October 15, 2021 ("Deferred Compensation Agreement")[1] and defaulted on the BSTX Promissory Note dated October 15, 2021 (the "Note").  With respect to the Employment Agreement only, you have thirty (30) days to cure your default.

 Further, I remind BSTX that a failure to pay wages is a violation of the Massachusetts Wage Act, G. L. c. 149, §148. A violation of the Wage Act will also result in a mandatory trebling of the unpaid wages, as well as interest, costs, and attorneys fees.  Moreover, liability under the Wage Act may extend to the personal liability of an individual who "'controls, directs, and participates to a substantial degree in formulating and determining' the financial policy of a business entity… ."  *Cook v. Patient Edu, LLC*, 465 Mss. 548 (2013).

This notice is provided to you at 101 Arch St., suite 1940, Boston MA in accordance with section 6 of the Employment Agreement.

I hereby reserve all rights, including all rights under the Employment Agreement, the Deferred Compensation Agreement, the Note, and the Massachusetts Wage Act, none of which are waived.

Sincerely,

*A. J. Fall*

Lisa J. Fall

---

[1]     I dispute the enforceability and legality of the Deferred Compensation Agreement, as Massachusetts law does not allow for the deferral of wages.

# EXHIBIT C

October 17, 2022

Boston Security Token Exchange LLC
101 Arch St., suite 1940
Boston, MA 02110

**RE:  Lisa J. Fall/Boston Security Token Exchange LLC**

Dear Sir/Madam

  For the avoidance of doubt, my correspondence to you yesterday constitutes notice of the existence of a condition for Good Reason termination of employment, pursuant to Section 6 of my Employment Agreement with BSTX.

Sincerely,

*L. J. Fall*

Lisa J. Fall

# EXHIBIT D

EX. D

## DEFERRAL AND EQUITY GRANT AGREEMENT

This Deferral and Equity Grant Agreement (this "Agreement") is entered into by and between Boston Security Token Exchange LLC, a Delaware limited liability company (the "Company"), and the undersigned (or an entity controlled by the undersigned and existing for estate planning purposes, the "Holder"), as of October 15, 2021 (the "Effective Date").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Reference is made to the Second Amended and Restated Limited Liability LLC Agreement of the Company in effect as of the Effective Date, as the same may be amended and restated and in effect from time to time (the "LLC Agreement"). Capitalized terms used without definition in this Agreement shall have the meanings given them in the LLC Agreement. Reference is made to the Employment Agreement, dated as of October 4, 2019, by and between the Holder and the Company, as the same may be amended and restated and in effect from time to time (the "Employment Agreement"). The Holder hereby agrees, pursuant to the terms of this Agreement, to defer receipt of all cash amounts due and payable to Holder pursuant to the Employment Agreement beginning the day after the Effective Date through the first anniversary of the Effective Date (the "Deferred Cash Payments").

2.  In lieu of the Deferred Cash Payments, the Holder agrees to receive and the Company hereby issues to the Holder, as of the Effective Date, (i) a promissory note, substantially in the form attached hereto as Exhibit A (the "Note") and (ii) 1,867 fully vested Class B Units (the "Units"). The Holder's rights and obligations respecting the Units shall be as provided in the LLC Agreement and in this Agreement.

3.  The Holder hereby becomes a party to, and agrees to abide by all the provisions of, the LLC Agreement and assumes all of the obligations of a Member thereunder holding the Units. This Agreement shall be deemed a counterpart of the LLC Agreement and the execution hereof by the Holder shall evidence the Holder's acceptance of the terms and provisions of the LLC Agreement. This Agreement shall take effect and shall become a part of the LLC Agreement as of the Effective Date. The Company hereby confirms and represents that the Holder is accepted as a Member.

4.  The Holder shall be entitled to transfer ownership of the Units and any other units of ownership interest in the Company held by the Holder to an entity controlled by the Holder for estate planning purposes and such entity shall be accepted as a Member of the Company. The Units may otherwise be transferred by the Holder only in accordance with the terms of the LLC Agreement.

5.  This Agreement and the offer, issuance and delivery of the Units or other securities are subject to compliance with all applicable federal and state laws, rules and regulations (including but not limited to state and federal securities laws) and to such approvals by any listing, regulatory or governmental authority as may, in the opinion of counsel for the

Company, be necessary or advisable in connection therewith.  Any securities delivered under this Agreement will be subject to such restrictions, and any person acquiring such securities will, if requested by the Company, provide such assurances and representations to the Company as the Company may deem necessary or desirable to assure compliance with all applicable legal requirements.

6.    The Holder agrees that, upon the request of the Company or the underwriter(s) of any offering of the securities of the Company that is the subject of a registration statement filed under the United States Securities Act of 1933, as amended from time to time (the "Act"), for a period of time (not to exceed 180 days, plus such additional number of days (not to exceed 35) as may reasonably be required by the underwriter(s) of such offering) from the effective date of the registration statement under the Act for such offering, the Holder will not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any of the Units, or of any securities of the Company issued in exchange for, upon conversion of or as a dividend or distribution on the Units, without the prior written consent of the Company and such underwriter(s).

7.    All notices, consents and other communications under this Agreement shall be in writing and shall be given and deemed to have been given in the manner specified in the LLC Agreement.

8.    This Agreement, the Note, the Employment Agreement and the LLC Agreement constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all prior understandings or agreements among them relating thereto.  The terms of the Employment Agreement remain in full force and effect except as specifically provided in this Agreement.  This Agreement may be amended only by an instrument in writing signed by the Company and the Holder.

9.    This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts without regard to its principles of conflicts of laws.

10.   The Holder agrees to execute and deliver such further instruments, certificates and documents as the Company may deem necessary or desirable from time to time to carry out the provisions of this Agreement, including without limitation any such instruments, certificates and documents as the Company may deem necessary or desirable under the LLC Agreement.

11.   This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall constitute a single agreement.

12.   This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and permitted assigns.

IN WITNESS WHEREOF, the parties have executed this Deferral and Equity Grant Agreement as of the Effective Date.

**BOSTON SECURITY TOKEN EXCHANGE LLC**

By: _Susan Chamberlin_
     Susan Chamberlin
     Chairman

**HOLDER:**

_____
     Lisa Fall

IN WITNESS WHEREOF, the parties have executed this Deferral and Equity Grant Agreement as of the Effective Date.

**BOSTON SECURITY TOKEN EXCHANGE LLC**

By: _Susan Chamberlin_
   Susan Chamberlin
   Chairman

**HOLDER:**

_Lisa Fall_
   Lisa Fall

# EXHIBIT E

# BOSTON SECURITY TOKEN EXCHANGE LLC

## PROMISSORY NOTE

As of October 15, 2021

FOR VALUE RECEIVED, the undersigned, Boston Security Token Exchange LLC, with its principal place of business at 101 Arch Street, Suite 1940, Boston, MA 02110 ("Borrower"), promises to pay to Lisa Fall at the same address ("Lender"), or at such other place as Lender may from time to time direct in writing, the principal amount equal to the sum of all accrued Deferred Cash Payments (as defined in the Deferral and Equity Grant Agreement, dated as of the date hereof, by and between the Lender and the Borrower, the "Principal") together with all accrued interest, as provided below, on October 15, 2022 (the "Payment Date").

Interest shall accrue for each day the Principal is unpaid in full.  The unpaid Principal balance shall bear interest at the rate per annum of Three Percent (3%).

This Note may be prepaid in whole or in part at any time without premium or penalty, provided, however, that regardless of any prepayment, additional Principal amounts and interest on any unpaid Principal shall continue to accrue under this Promissory Note (this "Note") through the Payment Date as Deferred Cash Payments become due and payable.

No part of this Note may be changed, waived or modified orally, but only by an agreement in writing signed by the party against whom enforcement of any such change, waiver or modification is sought.

The occurrence of any one or more of the following events, which shall continue after notice (if any is required) for the time specified therein, if any, shall constitute and is herein called an "Event of Default":

(i) Borrower shall fail to make any payment of principal or interest on this Note when and as the same shall become due and such failure shall continue for ten (10) days after Borrower receives written notice thereof from Lender.

(ii) Borrower shall be insolvent as evidenced: (a) by admitting in writing its inability to pay its debts generally as they become due; (b) by filing a petition in bankruptcy or for reorganization or the adoption of an arrangement under the Federal Bankruptcy Act, which petition is not dismissed within sixty (60) days, or by the entry of a court order approving a petition in bankruptcy or for reorganization or the adoption of an arrangement under the Federal Bankruptcy Act, or by filing an answer or other pleadings admitting or failing to deny the material allegations of such a petition or seeking, consenting to or acquiescing in the relief therein requested; (c) by making an assignment of its assets for the benefit of other creditors; or (d) by the appointment of a receiver or trustee (or other person performing a similar function) for all or a substantial part of its property; or

(iii) Borrower shall be adjudicated a bankrupt.

Upon the occurrence of any Event of Default, Lender may take all actions permitted by law for the collection of all amounts due hereunder.

Should the indebtedness or any part thereof be collected by action at law or in bankruptcy, receivership or other court proceedings, or should this Note be placed in the hands of an attorney for collection after an Event of Default, whether or not suit is filed hereon, Borrower agrees to pay, upon demand by the Lender, in addition to principal and interest and other sums, if any, due and payable hereon, court costs and reasonable attorneys' fees and other collection charges, unless prohibited by law.

Every payment hereunder shall be applied first to costs of collection, if any; second to amounts (other than principal and interest) due hereunder, if any; third to interest accrued hereon to the date of payment; and the balance, if any, to principal.

Notwithstanding anything herein to the contrary, the Lender, acting solely for this purpose as an agent of the Borrower, shall maintain at its principal office a copy of a register for the recordation of the names and addresses of the Lender and any person who is the recipient of any transfer, assignment, participation or other disposition or alienation of all or a portion of any rights of the Lender hereunder (any such recipient, a "Transferee") and the commitments of, and principal amounts (and related interest amounts) of the loans owing to the Lender and any Transferee from time to time, all as applicable (the "Register"). Notwithstanding anything herein to the contrary, the entries in the Register shall be conclusive absent manifest error, and the Borrower, the Lender, and each Transferee (if any), shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a lender and the owner of the amounts owing to it under this Note as reflected in the Register for all purposes of this Note and any other relevant agreements. The Register shall be available for inspection by the Borrower and any Transferee (if any), at any reasonable time and from time to time upon prior notice. This paragraph and the other provisions of this Note shall be construed so that any loans evidenced hereunder are maintained in registered form within the meaning of Sections 163(f), 871(h)(2), and 881(c)(2) of the U.S. Internal Revenue Code (the "Code"), Section 5f.103-1(c) of the Treasury Regulations and any other applicable U.S. federal tax authorities. For the avoidance of doubt, this paragraph shall not be understood as enlarging any of the rights, or the creation of any new rights, of Lender hereunder.

Except as provided herein, Borrower (i) consents and agrees to be bound by the provisions of this Note and promises, unconditionally, to pay the principal of, and interest on, this Note as herein provided, (ii) waives (to the fullest extent allowed by law) all requirements of diligence in collection, presentment, notice of non-payment, protest, notice of protest, suit and all other conditions precedent in connection with the collection and enforcement of the Note and (iii) agrees that no delay or omission in exercising any right or power under this Note, or the indebtedness evidenced hereby, shall affect Borrower's liability.

This Note shall be governed by and interpreted in accordance with the laws of the Commonwealth of Massachusetts. Each of Borrower and Lender irrevocably consents to the exclusive jurisdiction and venue of any court within the Commonwealth of Massachusetts in connection with any matter based upon or arising out of this Note, agrees that process may be served upon it in any manner authorized by the Laws of the Commonwealth of Massachusetts for such parties and waives, and covenants not to assert or plead, any objection which it might otherwise have to such jurisdiction, venue and process.

The invalidity of any provisions of this Note, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provisions hereof.

*[the remainder of this page is intentionally left blank]*

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first set forth above.

Boston Security Token Exchange LLC

By: _Susan Chamberlin_

Susan Chamberlin
Chairman

# EXHIBIT F

EX. F

# BOSTON SECURITY TOKEN EXCHANGE LLC

## Promissory Note

No. 1

$500,000                                March 10, 2022 (the "Issue Date")

For value received, Boston Security Token Exchange LLC, a Delaware limited liability company (the "Company"), hereby promises to pay to the order of BOX Holdings Group LLC (hereinafter together with successors in title and assigns referred to as the "Lender"), the principal sum of Five Hundred Thousand Dollars ($500,000), or such lesser principal amount as may be outstanding, together with interest from the date hereof on the principal amount outstanding from time to time, as specified below.

1.      Interest.  All principal amounts advanced or otherwise owing under this Note shall bear interest at an annual rate of three percent (3%) calculated based on a 365-day year, provided that upon the occurrence of an Event of Default (as defined below), for so long as such Event of Default is continuing, such amounts shall bear interest at an annual rate of five percent (5%) calculated based on a 365-day year. Interest shall be computed on the basis of the actual number of days elapsed.

2.      Maturity; Payments.  The principal amount outstanding under this Note together with accrued interest (the sum of such principal and accrued interest being hereinafter referred to as the "Outstanding Amount") and any costs and expenses under Section 7 hereof shall be due and payable on the earliest of: (a) December 31, 2022; (b) the first date on which the Company issues and sells, including (without limitation) to any existing equity holder of the Company, in one or more transactions, shares of its capital stock or other equity interests of the Company in one or more bona fide equity financings with aggregate net proceeds sufficient to repay all then existing indebtedness of the Company; and (c) any acceleration in accordance with the terms hereof.  Notwithstanding the foregoing, the Company may prepay this Note in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.  No repaid or prepaid amount may be reborrowed.

3.      Representations and Warranties.

(a)      Existence.  The Company is duly formed, validly existing and in good standing under the laws of Delaware.

(b)      Authorization; Execution; Enforceability.  The execution and delivery of this Note, the borrowing hereunder and the performance by the Company of its obligations hereunder are within the organizational power and authority of the Company, have been duly authorized by all necessary organizational action on the part of the Company and do not and will not contravene, conflict with or result in a violation or breach of, as applicable, any provision of the organizational documents of the Company, any material agreement of the Company or any applicable laws. This Note has been duly and validly executed and delivered by the Company

and constitutes the valid and binding agreement of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c)     No Approvals.  No consent or authorization of, filing with, notice to or other act by, or in respect of, any governmental authority or any other person is required in order for the Company to execute, deliver, or perform any of its obligations under this Note.

(d)     Indebtedness.  There is no outstanding indebtedness that is secured by any assets of the Company.

4.     Covenants.  The Company covenants and agrees that, until payment in full of all amounts payable under this Note:

(a)     Debt.  The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note and (ii) other indebtedness in an aggregate principal amount not to exceed $5,000,000.

(b)     Liens.  The Company shall not, directly or indirectly, create, incur, assume or suffer to exist any security interest or other security arrangement of any kind or nature whatsoever (a "Lien") upon any of its properties or assets whether now owned or hereafter acquired securing any obligations, other than Permitted Liens.  "Permitted Liens" means any (a) Lien imposed by law for taxes not yet due and payable or that are being properly contested by appropriate proceedings and for which adequate reserves have been maintained in accordance with generally accepted accounting principles, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (c) zoning, entitlement, conservation restriction and other land use and environmental regulations promulgated by governmental authorities, (d) any right, interest, lien, title or other encumbrance of a lessor or sublessor under any lease or other similar agreement or in the property being leased, (e) all exceptions, restrictions, easements, imperfections of title, charges, rights-of-way and other encumbrances that do not materially interfere with the present use of the assets of the Company, (f) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance or self-insurance to the Company, (g) Liens securing judgments or orders for the payment of money not constituting an Event of Default under Section 5(a)(vii), and (h) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not interfere in any material respect with the business of the Company, taken as a whole and leases, licenses, subleases or sublicenses constituting a disposition permitted hereunder.

(c)     Dispositions.  The Company shall not directly or indirectly convey, sell, transfer, lease, assign or otherwise dispose of, or agree to convey, sell, transfer, lease, assign, or

- 2 -

otherwise dispose of (whether in one or a series of transactions) (collectively, "Transfer") all or any part of its business or property, except for Transfers: (i) of inventory in the ordinary course of business, (ii) Transfers of used, worn out, obsolete or surplus property in the ordinary course of business and (iii) Transfers of cash and cash equivalents in the ordinary course of business.

        (d)   <u>Use of Proceeds</u>.  The Company shall not use the proceeds of this Note to make cash payments to Lisa Fall.

5.    <u>Default</u>.

        (a)   This Note shall become immediately due and payable, and all amounts in respect of this Note shall be immediately accelerated, upon notice and demand by the Lender (except in the case of clauses (i) and (ii) below, which events (each an "<u>Insolvency Event</u>") shall not require notice or demand and in respect of which events such acceleration shall be automatic without any notice, demand, or other action of any person or entity), upon the occurrence of any of the following events of default (individually, "<u>an Event of Default</u>" and collectively, "<u>Events of Default</u>"):

        (i)   the liquidation, dissolution or insolvency of the Company, the adoption of any liquidation, dissolution, or insolvency resolution or plan by the Company or its directors, or the appointment of a receiver or custodian for the Company of all or substantially all of its property, if, in the case of an appointment that is not consented to and is opposed by the Company, such appointment is not terminated or dismissed within 30 days;

        (ii)   the institution by or against the Company of any proceedings under the United States Bankruptcy Code or any other federal or state bankruptcy, reorganization, receivership, assignment for the benefit of creditors, insolvency or other similar law affecting the rights of creditors generally;

        (iii)   the breach by the Company of any of its representations, warranties or covenants set forth herein, except in the case of breaches that are curable, in which case the Company shall have thirty (30) days to effect such cure;

        (iv)   the sale of all or substantially all of the assets or business of the Company, whether by merger, sale of assets, sale of stock or otherwise;

        (v)   the failure of the Company to make any payment of principal or interest when due on this Note;

        (vi)   the breach or default under any agreement, instrument or document to which the Company is a party or by which it is bound, involving any obligation for borrowed money, unless such breach or default is cured in accordance with such agreement, instrument, or document without the counterparty thereto having taken any action to enforce remedies as a result thereof; or

        (vii)   one or more final judgments or orders for the payment of money aggregating in excess of $100,000 (or its equivalent in the relevant currency of payment),

including any such final order enforcing a binding arbitration decision (to the extent not covered by independent third party insurance as to which the insurer does not dispute coverage), are rendered against the Company and which judgments are not, within 30 days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged or vacated within 30 days after the expiration of such stay.

(b)     Upon the occurrence of an Event of Default, the Lender shall have then, or at any time thereafter, all of the rights and remedies afforded by applicable law or in equity or to which the Lender is entitled under this Note. Lender shall be entitled to set off all or any portion of the unpaid principal under this Note against any indebtedness owed by the Lender to the Company.

6.     <u>No Set-Off</u>. All payments by the Company under this Note shall be made without set-off or counterclaim and be without any deduction or withholding for any taxes or fees of any nature, unless the obligation to make such deduction or withholding is imposed by law.

7.     <u>Collection Expenses</u>. If this Note is not paid in accordance with its terms, or if an Event of Default shall have occurred, the Company shall pay to the Lender, in addition to principal and accrued interest thereon, all costs of collection of this Note, and of protecting, preserving or enforcing the Lender's rights under or in respect of this Note, including but not limited to reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note, whether or not in connection with any Insolvency Event. Amounts due under this Section 7 shall become part of the principal amount hereunder and accrue interest as set forth in Section 1 above.

8.     <u>Waivers</u>. The Company hereby expressly and irrevocably waives presentment, demand, protest, notice of protest and all other notices in connection with this Note. No delay or extension on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note, and a waiver of any right on any one occasion shall not operate as a waiver of such right on any future occasion.

9.     <u>General</u>.

(a)     <u>Transfers; Successors and Assigns</u>. This Note, and the obligations and rights of the Company hereunder, shall be binding upon and inure to the benefit of the Company, the holder of this Note, and their respective heirs, successors and assigns; provided, however, that the Company may not transfer or assign its obligations hereunder, by operation of law or otherwise, without the consent of the Lender, which consent shall not be unreasonably withheld. The Lender may not transfer or assign its rights hereunder, by operation of law or otherwise, without the consent of the Company, which consent shall not be unreasonably withheld; provided that the Lender shall transfer and assign all of its rights hereunder to BOX Digital Markets LLC prior to, and as a condition of, Lender's ceasing to be a majority owner of all equity interests in BOX Digital Markets LLC.

(b)     <u>Changes</u>. The terms and provisions of this Note may be modified or amended only by a written instrument duly executed by the Company and by the Lender.

- 4 -

(c)    Notices.  All notices, requests, consents and demands shall be made in writing and shall be mailed postage prepaid, or delivered by hand, to the Company or to the holder hereof at their respective addresses set forth below or to such other address as may be furnished in writing to the other party hereto:

> If to the Lender:    BOX Holdings Group LLC
> 101 Arch Street, Suite 610
> Boston, MA
> Attn: Lisa Ruggiero
>
> With a copy to:    George Shuster, Esq.
> Wilmer Cutler Pickering Hale and Dorr LLP
> 60 State Street
> Boston, MA 02109
>
> If to the Company:    Boston Security Token Exchange LLC
> 101 Arch Street, Suite 1940
> Boston, MA  02110
> Attn: Lisa Fall, CEO
>
> With a copy to:    Glen Openshaw, Esq.
> Acquire Law LLC
> Ten Post Office Square, South Tower, 8th Floor
> Boston, MA  02109

10.    Enforceability.  In the event any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, then such provision(s) only shall be deemed null and void and shall not affect any other provision of this Note, and the remaining provisions of this Note shall remain operative and in full force and effect and in no way shall be affected, prejudiced or disturbed thereby.

11.    Officers and Directors Not Liable.  In no event shall any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

12.    Governing Law.  This Note and the obligations of the Company hereunder shall be governed by and interpreted and determined in accordance with the laws of the State of New York (excluding the laws and rules of law applicable to conflicts or choice of law).

13.    Loss of Note.  Upon receipt by the Company of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Note or any Note exchanged for it, and indemnity reasonably satisfactory to the Company (in case of loss, theft or destruction) or surrender and cancellation of such Note (in the case of mutilation), the Company will make and deliver in lieu of such Note a new Note of like tenor.

*[Signature on following page]*

IN WITNESS WHEREOF, this Note has been duly executed on behalf of the undersigned on the day and in the year first written above.

**Boston Security Token Exchange LLC**

By: *Susan Chamberlin*

Name: Susan Chamberlin

Title:   Chair, Board of Directors
Boston Security Token Exchange LLC

# EXHIBIT G

EX. G

# BOSTON SECURITY TOKEN EXCHANGE LLC

## Promissory Note

No. 2

$400,000                                          May 5, 2022 (the "Issue Date")

       For value received, Boston Security Token Exchange LLC, a Delaware limited liability company (the "Company"), hereby promises to pay to the order of BOX Holdings Group LLC (hereinafter together with successors in title and assigns referred to as the "Lender"), the principal sum of Five Hundred Thousand Dollars ($400,000), or such lesser principal amount as may be outstanding, together with interest from the date hereof on the principal amount outstanding from time to time, as specified below.

       1.    Interest.  All principal amounts advanced or otherwise owing under this Note shall bear interest at an annual rate of three percent (3%) calculated based on a 365-day year, provided that upon the occurrence of an Event of Default (as defined below), for so long as such Event of Default is continuing, such amounts shall bear interest at an annual rate of five percent (5%) calculated based on a 365-day year. Interest shall be computed on the basis of the actual number of days elapsed.

       2.    Maturity; Payments.  The principal amount outstanding under this Note together with accrued interest (the sum of such principal and accrued interest being hereinafter referred to as the "Outstanding Amount") and any costs and expenses under Section 7 hereof shall be due and payable on the earliest of: (a) December 31, 2022; (b) the first date on which the Company issues and sells, including (without limitation) to any existing equity holder of the Company, in one or more transactions, shares of its capital stock or other equity interests of the Company in one or more bona fide equity financings with aggregate net proceeds sufficient to repay all then existing indebtedness of the Company; and (c) any acceleration in accordance with the terms hereof. Notwithstanding the foregoing, the Company may prepay this Note in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.  No repaid or prepaid amount may be reborrowed.

       3.    Representations and Warranties.

       (a)    Existence.  The Company is duly formed, validly existing and in good standing under the laws of Delaware.

       (b)    Authorization; Execution; Enforceability.  The execution and delivery of this Note, the borrowing hereunder and the performance by the Company of its obligations hereunder are within the organizational power and authority of the Company, have been duly authorized by all necessary organizational action on the part of the Company and do not and will not contravene, conflict with or result in a violation or breach of, as applicable, any provision of the organizational documents of the Company, any material agreement of the Company or any applicable laws. This Note has been duly and validly executed and delivered by the Company

and constitutes the valid and binding agreement of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c) <u>No Approvals</u>. No consent or authorization of, filing with, notice to or other act by, or in respect of, any governmental authority or any other person is required in order for the Company to execute, deliver, or perform any of its obligations under this Note.

(d) <u>Indebtedness</u>. There is no outstanding indebtedness that is secured by any assets of the Company.

4. <u>Covenants</u>. The Company covenants and agrees that, until payment in full of all amounts payable under this Note:

(a) <u>Debt</u>. The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 1, dated as of March 10, 2022 (the "First Note"), issued by the Company to the Lender, and (iii) other indebtedness in an aggregate principal amount not to exceed $5,000,000.

(b) <u>Liens</u>. The Company shall not, directly or indirectly, create, incur, assume or suffer to exist any security interest or other security arrangement of any kind or nature whatsoever (a "<u>Lien</u>") upon any of its properties or assets whether now owned or hereafter acquired securing any obligations, other than Permitted Liens. "<u>Permitted Liens</u>" means any (a) Lien imposed by law for taxes not yet due and payable or that are being properly contested by appropriate proceedings and for which adequate reserves have been maintained in accordance with generally accepted accounting principles, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (c) zoning, entitlement, conservation restriction and other land use and environmental regulations promulgated by governmental authorities, (d) any right, interest, lien, title or other encumbrance of a lessor or sublessor under any lease or other similar agreement or in the property being leased, (e) all exceptions, restrictions, easements, imperfections of title, charges, rights-of-way and other encumbrances that do not materially interfere with the present use of the assets of the Company, (f) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance or self-insurance to the Company, (g) Liens securing judgments or orders for the payment of money not constituting an Event of Default under Section 5(a)(vii), and (h) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not interfere in any material respect with the business of the Company, taken as a whole and leases, licenses, subleases or sublicenses constituting a disposition permitted hereunder.

-2-

(c)  Dispositions.  The Company shall not directly or indirectly convey, sell, transfer, lease, assign or otherwise dispose of, or agree to convey, sell, transfer, lease, assign, or otherwise dispose of (whether in one or a series of transactions) (collectively, "Transfer") all or any part of its business or property, except for Transfers: (i) of inventory in the ordinary course of business, (ii) Transfers of used, worn out, obsolete or surplus property in the ordinary course of business and (iii) Transfers of cash and cash equivalents in the ordinary course of business.

(d)  Use of Proceeds.  The Company shall not use the proceeds of this Note to make cash payments to Lisa Fall.

5.  Default.

(a)  This Note shall become immediately due and payable, and all amounts in respect of this Note shall be immediately accelerated, upon notice and demand by the Lender (except in the case of clauses (i) and (ii) below, which events (each an "Insolvency Event") shall not require notice or demand and in respect of which events such acceleration shall be automatic without any notice, demand, or other action of any person or entity), upon the occurrence of any of the following events of default (individually, "an Event of Default" and collectively, "Events of Default"):

(i)  the liquidation, dissolution or insolvency of the Company, the adoption of any liquidation, dissolution, or insolvency resolution or plan by the Company or its directors, or the appointment of a receiver or custodian for the Company of all or substantially all of its property, if, in the case of an appointment that is not consented to and is opposed by the Company, such appointment is not terminated or dismissed within 30 days;

(ii)  the institution by or against the Company of any proceedings under the United States Bankruptcy Code or any other federal or state bankruptcy, reorganization, receivership, assignment for the benefit of creditors, insolvency or other similar law affecting the rights of creditors generally;

(iii)  the breach by the Company of any of its representations, warranties or covenants set forth herein, except in the case of breaches that are curable, in which case the Company shall have thirty (30) days to effect such cure;

(iv)  the sale of all or substantially all of the assets or business of the Company, whether by merger, sale of assets, sale of stock or otherwise;

(v)  the failure of the Company to make any payment of principal or interest when due on this Note;

(vi)  the breach or default under any agreement, instrument or document to which the Company is a party or by which it is bound, involving any obligation for borrowed money, unless such breach or default is cured in accordance with such agreement, instrument, or document without the counterparty thereto having taken any action to enforce remedies as a result thereof; or

-3-

(vii)   one or more final judgments or orders for the payment of money aggregating in excess of $100,000 (or its equivalent in the relevant currency of payment), including any such final order enforcing a binding arbitration decision (to the extent not covered by independent third party insurance as to which the insurer does not dispute coverage), are rendered against the Company and which judgments are not, within 30 days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged or vacated within 30 days after the expiration of such stay.

(b)   Upon the occurrence of an Event of Default, the Lender shall have then, or at any time thereafter, all of the rights and remedies afforded by applicable law or in equity or to which the Lender is entitled under this Note. Lender shall be entitled to set off all or any portion of the unpaid principal under this Note against any indebtedness owed by the Lender to the Company.

6.   No Set-Off.  All payments by the Company under this Note shall be made without set-off or counterclaim and be without any deduction or withholding for any taxes or fees of any nature, unless the obligation to make such deduction or withholding is imposed by law.

7.   Collection Expenses.  If this Note is not paid in accordance with its terms, or if an Event of Default shall have occurred, the Company shall pay to the Lender, in addition to principal and accrued interest thereon, all costs of collection of this Note, and of protecting, preserving or enforcing the Lender's rights under or in respect of this Note, including but not limited to reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note, whether or not in connection with any Insolvency Event. Amounts due under this Section 7 shall become part of the principal amount hereunder and accrue interest as set forth in Section 1 above.

8.   Waivers.  The Company hereby expressly and irrevocably waives presentment, demand, protest, notice of protest and all other notices in connection with this Note. No delay or extension on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note, and a waiver of any right on any one occasion shall not operate as a waiver of such right on any future occasion.

9.   General.

(a)   Transfers; Successors and Assigns.  This Note, and the obligations and rights of the Company hereunder, shall be binding upon and inure to the benefit of the Company, the holder of this Note, and their respective heirs, successors and assigns; provided, however, that the Company may not transfer or assign its obligations hereunder, by operation of law or otherwise, without the consent of the Lender, which consent shall not be unreasonably withheld. The Lender may not transfer or assign its rights hereunder, by operation of law or otherwise, without the consent of the Company, which consent shall not be unreasonably withheld; provided that the Lender shall transfer and assign all of its rights hereunder to BOX Digital Markets LLC prior to, and as a condition of, Lender's ceasing to be a majority owner of all equity interests in BOX Digital Markets LLC.

(b)    Changes.   The terms and provisions of this Note may be modified or amended only by a written instrument duly executed by the Company and by the Lender.

(c)    Notices.   All notices, requests, consents and demands shall be made in writing and shall be mailed postage prepaid, or delivered by hand, to the Company or to the holder hereof at their respective addresses set forth below or to such other address as may be furnished in writing to the other party hereto:

| | |
|---|---|
| If to the Lender: | BOX Holdings Group LLC<br>101 Arch Street, Suite 610<br>Boston, MA<br>Attn: Lisa Ruggiero |
| With a copy to: | George Shuster, Esq.<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>60 State Street<br>Boston, MA 02109 |
| If to the Company: | Boston Security Token Exchange LLC<br>101 Arch Street, Suite 1940<br>Boston, MA 02110<br>Attn: Lisa Fall, CEO |
| With a copy to: | Glen Openshaw, Esq.<br>Acquire Law LLC<br>Ten Post Office Square, South Tower, 8th Floor<br>Boston, MA 02109 |

10.    Enforceability.   In the event any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, then such provision(s) only shall be deemed null and void and shall not affect any other provision of this Note, and the remaining provisions of this Note shall remain operative and in full force and effect and in no way shall be affected, prejudiced or disturbed thereby.

11.    Officers and Directors Not Liable.   In no event shall any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

12.    Governing Law.   This Note and the obligations of the Company hereunder shall be governed by and interpreted and determined in accordance with the laws of the State of New York (excluding the laws and rules of law applicable to conflicts or choice of law).

13.    Loss of Note.   Upon receipt by the Company of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Note or any Note exchanged for it, and indemnity reasonably satisfactory to the Company (in case of loss, theft or destruction) or surrender and cancellation of such Note (in the case of mutilation), the Company will make and deliver in lieu of such Note a new Note of like tenor.

14.   <u>Amendment to First Note</u>.   Pursuant to Section 9(b) of the First Note, the Company and the Lender hereby agree to delete Section 4(a) of the First Note in its entirety and replace it with the following:

"<u>Debt</u>.   The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 2, dated as of May 5, 2022, issued by the Company to the Lender, and (iii) other indebtedness in an aggregate principal amount not to exceed $5,000,000."

*[Signature on following page]*

-6-

IN WITNESS WHEREOF, this Note has been duly executed on behalf of the undersigned on the day and in the year first written above.

Boston Security Token Exchange LLC

By: _M. M. Batta_

Name:   DAVID M. BATTAN

Title:   Chairman, BSTX

# EXHIBIT H

EX. H

# BOSTON SECURITY TOKEN EXCHANGE LLC

## Promissory Note

No. 3

$100,000                                    May 16, 2022 (the "Issue Date")

For value received, Boston Security Token Exchange LLC, a Delaware limited liability company (the "Company"), hereby promises to pay to the order of BOX Holdings Group LLC (hereinafter together with successors in title and assigns referred to as the "Lender"), the principal sum of One Hundred Thousand Dollars ($100,000), or such lesser principal amount as may be outstanding, together with interest from the date hereof on the principal amount outstanding from time to time, as specified below.

1.      Interest.  All principal amounts advanced or otherwise owing under this Note shall bear interest at an annual rate of three percent (3%) calculated based on a 365-day year, provided that upon the occurrence of an Event of Default (as defined below), for so long as such Event of Default is continuing, such amounts shall bear interest at an annual rate of five percent (5%) calculated based on a 365-day year. Interest shall be computed on the basis of the actual number of days elapsed.

2.      Maturity; Payments.  The principal amount outstanding under this Note together with accrued interest (the sum of such principal and accrued interest being hereinafter referred to as the "Outstanding Amount") and any costs and expenses under Section 7 hereof shall be due and payable on the earliest of: (a) December 31, 2022; (b) the first date on which the Company issues and sells, including (without limitation) to any existing equity holder of the Company, in one or more transactions, shares of its capital stock or other equity interests of the Company in one or more bona fide equity financings with aggregate net proceeds sufficient to repay all then existing indebtedness of the Company; and (c) any acceleration in accordance with the terms hereof. Notwithstanding the foregoing, the Company may prepay this Note in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment. No repaid or prepaid amount may be reborrowed.

3.      Representations and Warranties.

(a)      Existence.  The Company is duly formed, validly existing and in good standing under the laws of Delaware.

(b)      Authorization; Execution; Enforceability.  The execution and delivery of this Note, the borrowing hereunder and the performance by the Company of its obligations hereunder are within the organizational power and authority of the Company, have been duly authorized by all necessary organizational action on the part of the Company and do not and will not contravene, conflict with or result in a violation or breach of, as applicable, any provision of the organizational documents of the Company, any material agreement of the Company or any applicable laws. This Note has been duly and validly executed and delivered by the Company

and constitutes the valid and binding agreement of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c)     No Approvals.  No consent or authorization of, filing with, notice to or other act by, or in respect of, any governmental authority or any other person is required in order for the Company to execute, deliver, or perform any of its obligations under this Note.

(d)     Indebtedness.  There is no outstanding indebtedness that is secured by any assets of the Company.

4.     Covenants.  The Company covenants and agrees that, until payment in full of all amounts payable under this Note:

(a)     Debt.  The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 1, dated as of March 10, 2022 (the "First Note"), issued by the Company to the Lender, (iii) indebtedness under that certain Promissory Note No. 2, dated as of May 5, 2022 (the "Second Note"), issued by the Company to the Lender, and (iv) other indebtedness in an aggregate principal amount not to exceed $5,000,000.

(b)     Liens.  The Company shall not, directly or indirectly, create, incur, assume or suffer to exist any security interest or other security arrangement of any kind or nature whatsoever (a "Lien") upon any of its properties or assets whether now owned or hereafter acquired securing any obligations, other than Permitted Liens.  "Permitted Liens" means any (a) Lien imposed by law for taxes not yet due and payable or that are being properly contested by appropriate proceedings and for which adequate reserves have been maintained in accordance with generally accepted accounting principles, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (c) zoning, entitlement, conservation restriction and other land use and environmental regulations promulgated by governmental authorities, (d) any right, interest, lien, title or other encumbrance of a lessor or sublessor under any lease or other similar agreement or in the property being leased, (e) all exceptions, restrictions, easements, imperfections of title, charges, rights-of-way and other encumbrances that do not materially interfere with the present use of the assets of the Company, (f) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance or self-insurance to the Company, (g) Liens securing judgments or orders for the payment of money not constituting an Event of Default under Section 5(a)(vii), and (h) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not interfere in any material respect with the business of the Company, taken as a

whole and leases, licenses, subleases or sublicenses constituting a disposition permitted hereunder.

(c)     <u>Dispositions</u>.  The Company shall not directly or indirectly convey, sell, transfer, lease, assign or otherwise dispose of, or agree to convey, sell, transfer, lease, assign, or otherwise dispose of (whether in one or a series of transactions) (collectively, "<u>Transfer</u>") all or any part of its business or property, except for Transfers: (i) of inventory in the ordinary course of business, (ii) Transfers of used, worn out, obsolete or surplus property in the ordinary course of business and (iii) Transfers of cash and cash equivalents in the ordinary course of business.

(d)     <u>Use of Proceeds</u>.  The Company shall not use the proceeds of this Note to make cash payments to Lisa Fall.

5.     <u>Default</u>.

(a)     This Note shall become immediately due and payable, and all amounts in respect of this Note shall be immediately accelerated, upon notice and demand by the Lender (except in the case of clauses (i) and (ii) below, which events (each an "<u>Insolvency Event</u>") shall not require notice or demand and in respect of which events such acceleration shall be automatic without any notice, demand, or other action of any person or entity), upon the occurrence of any of the following events of default (individually, "<u>an Event of Default</u>" and collectively, "<u>Events of Default</u>"):

(i)     the liquidation, dissolution or insolvency of the Company, the adoption of any liquidation, dissolution, or insolvency resolution or plan by the Company or its directors, or the appointment of a receiver or custodian for the Company of all or substantially all of its property, if, in the case of an appointment that is not consented to and is opposed by the Company, such appointment is not terminated or dismissed within 30 days;

(ii)     the institution by or against the Company of any proceedings under the United States Bankruptcy Code or any other federal or state bankruptcy, reorganization, receivership, assignment for the benefit of creditors, insolvency or other similar law affecting the rights of creditors generally;

(iii)     the breach by the Company of any of its representations, warranties or covenants set forth herein, except in the case of breaches that are curable, in which case the Company shall have thirty (30) days to effect such cure;

(iv)     the sale of all or substantially all of the assets or business of the Company, whether by merger, sale of assets, sale of stock or otherwise;

(v)     the failure of the Company to make any payment of principal or interest when due on this Note;

(vi)     the breach or default under any agreement, instrument or document to which the Company is a party or by which it is bound, involving any obligation for borrowed money, unless such breach or default is cured in accordance with such

agreement, instrument, or document without the counterparty thereto having taken any action to enforce remedies as a result thereof; or

(vii)    one or more final judgments or orders for the payment of money aggregating in excess of $100,000 (or its equivalent in the relevant currency of payment), including any such final order enforcing a binding arbitration decision (to the extent not covered by independent third party insurance as to which the insurer does not dispute coverage), are rendered against the Company and which judgments are not, within 30 days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged or vacated within 30 days after the expiration of such stay.

(b)    Upon the occurrence of an Event of Default, the Lender shall have then, or at any time thereafter, all of the rights and remedies afforded by applicable law or in equity or to which the Lender is entitled under this Note.  Lender shall be entitled to set off all or any portion of the unpaid principal under this Note against any indebtedness owed by the Lender to the Company.

6.    No Set-Off.  All payments by the Company under this Note shall be made without set-off or counterclaim and be without any deduction or withholding for any taxes or fees of any nature, unless the obligation to make such deduction or withholding is imposed by law.

7.    Collection Expenses.  If this Note is not paid in accordance with its terms, or if an Event of Default shall have occurred, the Company shall pay to the Lender, in addition to principal and accrued interest thereon, all costs of collection of this Note, and of protecting, preserving or enforcing the Lender's rights under or in respect of this Note, including but not limited to reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note, whether or not in connection with any Insolvency Event.  Amounts due under this Section 7 shall become part of the principal amount hereunder and accrue interest as set forth in Section 1 above.

8.    Waivers.  The Company hereby expressly and irrevocably waives presentment, demand, protest, notice of protest and all other notices in connection with this Note.  No delay or extension on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note, and a waiver of any right on any one occasion shall not operate as a waiver of such right on any future occasion.

9.    General.

(a)    Transfers; Successors and Assigns.  This Note, and the obligations and rights of the Company hereunder, shall be binding upon and inure to the benefit of the Company, the holder of this Note, and their respective heirs, successors and assigns; provided, however, that the Company may not transfer or assign its obligations hereunder, by operation of law or otherwise, without the consent of the Lender, which consent shall not be unreasonably withheld. The Lender may not transfer or assign its rights hereunder, by operation of law or otherwise, without the consent of the Company, which consent shall not be unreasonably withheld; provided that the Lender shall transfer and assign all of its rights hereunder to BOX Digital

- 4 -

Markets LLC prior to, and as a condition of, Lender's ceasing to be a majority owner of all equity interests in BOX Digital Markets LLC.

(b)     Changes.  The terms and provisions of this Note may be modified or amended only by a written instrument duly executed by the Company and by the Lender.

(c)     Notices.  All notices, requests, consents and demands shall be made in writing and shall be mailed postage prepaid, or delivered by hand, to the Company or to the holder hereof at their respective addresses set forth below or to such other address as may be furnished in writing to the other party hereto:

| | |
|---|---|
| If to the Lender: | BOX Holdings Group LLC<br>101 Arch Street, Suite 610<br>Boston, MA<br>Attn: Lisa Ruggiero |
| With a copy to: | George Shuster, Esq.<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>60 State Street<br>Boston, MA 02109 |
| If to the Company: | Boston Security Token Exchange LLC<br>101 Arch Street, Suite 1940<br>Boston, MA  02110<br>Attn: Lisa Fall, CEO |
| With a copy to: | Glen Openshaw, Esq.<br>Acquire Law LLC<br>Ten Post Office Square, South Tower, 8th Floor<br>Boston, MA  02109 |

10.     Enforceability.  In the event any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, then such provision(s) only shall be deemed null and void and shall not affect any other provision of this Note, and the remaining provisions of this Note shall remain operative and in full force and effect and in no way shall be affected, prejudiced or disturbed thereby.

11.     Officers and Directors Not Liable.  In no event shall any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

12.     Governing Law.  This Note and the obligations of the Company hereunder shall be governed by and interpreted and determined in accordance with the laws of the State of New York (excluding the laws and rules of law applicable to conflicts or choice of law).

13.     Loss of Note.  Upon receipt by the Company of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Note or any Note exchanged for it, and indemnity reasonably satisfactory to the Company (in case of loss, theft or destruction) or surrender and

cancellation of such Note (in the case of mutilation), the Company will make and deliver in lieu of such Note a new Note of like tenor.

14.    <u>Amendment to First Note</u>.    Pursuant to Section 9(b) of the First Note, the Company and the Lender hereby agree to delete Section 4(a) of the First Note in its entirety and replace it with the following:

> "<u>Debt</u>.    The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 2, dated as of May 5, 2022, issued by the Company to the Lender, (iii) indebtedness under that certain Promissory Note No. 3, dated as of May 16, 2022 (the "Third Note"), issued by the Company to the Lender, and (iv) other indebtedness in an aggregate principal amount not to exceed $5,000,000."

15.    <u>Amendment to Second Note</u>.    Pursuant to Section 9(b) of the Second Note, the Company and the Lender hereby agree to delete Section 4(a) of the Second Note in its entirety and replace it with the following:

> "<u>Debt</u>.    The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 1, dated as of March 10, 2022, issued by the Company to the Lender, (iii) indebtedness under that certain Promissory Note No. 3, dated as of May 16, 2022 (the "Third Note"), issued by the Company to the Lender, and (iv) other indebtedness in an aggregate principal amount not to exceed $5,000,000."

*[Signature on following page]*

ACTIVEUS 194572709v.4

IN WITNESS WHEREOF, this Note has been duly executed on behalf of the undersigned on the day and in the year first written above.

**Boston Security Token Exchange LLC**

By: _____

Name: David M. Battan

Title: Chairman

# EXHIBIT I

## BOSTON SECURITY TOKEN EXCHANGE LLC

### Promissory Note

No. 4

**$100,000**                                           July 28, 2022 (the "Issue Date")

For value received, Boston Security Token Exchange LLC, a Delaware limited liability company (the "Company"), hereby promises to pay to the order of BOX Holdings Group LLC (hereinafter together with successors in title and assigns referred to as the "Lender"), the principal sum of One Hundred Thousand Dollars ($100,000), or such lesser principal amount as may be outstanding, together with interest from the date hereof on the principal amount outstanding from time to time, as specified below.

1.    Interest.   All principal amounts advanced or otherwise owing under this Note shall bear interest at an annual rate of three percent (3%) calculated based on a 365-day year, provided that upon the occurrence of an Event of Default (as defined below), for so long as such Event of Default is continuing, such amounts shall bear interest at an annual rate of five percent (5%) calculated based on a 365-day year. Interest shall be computed on the basis of the actual number of days elapsed.

2.    Maturity; Payments.   The principal amount outstanding under this Note together with accrued interest (the sum of such principal and accrued interest being hereinafter referred to as the "Outstanding Amount") and any costs and expenses under Section 7 hereof shall be due and payable on the earliest of: (a) December 31, 2022; (b) the first date on which the Company issues and sells, including (without limitation) to any existing equity holder of the Company, in one or more transactions, shares of its capital stock or other equity interests of the Company in one or more bona fide equity financings with aggregate net proceeds sufficient to repay all then existing indebtedness of the Company; and (c) any acceleration in accordance with the terms hereof. Notwithstanding the foregoing, the Company may prepay this Note in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.  No repaid or prepaid amount may be reborrowed.

3.    Representations and Warranties.

(a)    Existence.   The Company is duly formed, validly existing and in good standing under the laws of Delaware.

(b)    Authorization; Execution; Enforceability.   The execution and delivery of this Note, the borrowing hereunder and the performance by the Company of its obligations hereunder are within the organizational power and authority of the Company, have been duly authorized by all necessary organizational action on the part of the Company and do not and will not contravene, conflict with or result in a violation or breach of, as applicable, any provision of the organizational documents of the Company, any material agreement of the Company or any applicable laws. This Note has been duly and validly executed and delivered by the Company

and constitutes the valid and binding agreement of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c) <u>No Approvals</u>. No consent or authorization of, filing with, notice to or other act by, or in respect of, any governmental authority or any other person is required in order for the Company to execute, deliver, or perform any of its obligations under this Note.

(d) <u>Indebtedness</u>. There is no outstanding indebtedness that is secured by any assets of the Company.

4. <u>Covenants</u>. The Company covenants and agrees that, until payment in full of all amounts payable under this Note:

(a) <u>Debt</u>. The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 1, dated as of March 10, 2022 (the "<u>First Note</u>"), issued by the Company to the Lender, (iii) indebtedness under that certain Promissory Note No. 2, dated as of May 5, 2022 (the "<u>Second Note</u>"), issued by the Company to the Lender, (iv) indebtedness under that certain Promissory Note No. 3, dated as of May 16, 2022 (the "<u>Third Note</u>"), issued by the Company to the Lender, and (v) other indebtedness in an aggregate principal amount not to exceed $5,000,000.

(b) <u>Liens</u>. The Company shall not, directly or indirectly, create, incur, assume or suffer to exist any security interest or other security arrangement of any kind or nature whatsoever (a "<u>Lien</u>") upon any of its properties or assets whether now owned or hereafter acquired securing any obligations, other than Permitted Liens. "<u>Permitted Liens</u>" means any (a) Lien imposed by law for taxes not yet due and payable or that are being properly contested by appropriate proceedings and for which adequate reserves have been maintained in accordance with generally accepted accounting principles, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (c) zoning, entitlement, conservation restriction and other land use and environmental regulations promulgated by governmental authorities, (d) any right, interest, lien, title or other encumbrance of a lessor or sublessor under any lease or other similar agreement or in the property being leased, (e) all exceptions, restrictions, easements, imperfections of title, charges, rights-of-way and other encumbrances that do not materially interfere with the present use of the assets of the Company, (f) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance or self-insurance to the Company, (g) Liens securing judgments or orders for the payment of money not constituting an Event of Default under Section 5(a)(vii), and (h) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not interfere in any material respect with the business of the Company, taken as a

whole and leases, licenses, subleases or sublicenses constituting a disposition permitted hereunder.

(c)     Dispositions.  The Company shall not directly or indirectly convey, sell, transfer, lease, assign or otherwise dispose of, or agree to convey, sell, transfer, lease, assign, or otherwise dispose of (whether in one or a series of transactions) (collectively, "Transfer") all or any part of its business or property, except for Transfers: (i) of inventory in the ordinary course of business, (ii) Transfers of used, worn out, obsolete or surplus property in the ordinary course of business and (iii) Transfers of cash and cash equivalents in the ordinary course of business.

(d)     Use of Proceeds.  The Company shall not use the proceeds of this Note to make cash payments to Lisa Fall.

5.     Default.

(a)     This Note shall become immediately due and payable, and all amounts in respect of this Note shall be immediately accelerated, upon notice and demand by the Lender (except in the case of clauses (i) and (ii) below, which events (each an "Insolvency Event") shall not require notice or demand and in respect of which events such acceleration shall be automatic without any notice, demand, or other action of any person or entity), upon the occurrence of any of the following events of default (individually, "an Event of Default" and collectively, "Events of Default"):

(i)     the liquidation, dissolution or insolvency of the Company, the adoption of any liquidation, dissolution, or insolvency resolution or plan by the Company or its directors, or the appointment of a receiver or custodian for the Company of all or substantially all of its property, if, in the case of an appointment that is not consented to and is opposed by the Company, such appointment is not terminated or dismissed within 30 days;

(ii)     the institution by or against the Company of any proceedings under the United States Bankruptcy Code or any other federal or state bankruptcy, reorganization, receivership, assignment for the benefit of creditors, insolvency or other similar law affecting the rights of creditors generally;

(iii)     the breach by the Company of any of its representations, warranties or covenants set forth herein, except in the case of breaches that are curable, in which case the Company shall have thirty (30) days to effect such cure;

(iv)     the sale of all or substantially all of the assets or business of the Company, whether by merger, sale of assets, sale of stock or otherwise;

(v)     the failure of the Company to make any payment of principal or interest when due on this Note;

(vi)     the breach or default under any agreement, instrument or document to which the Company is a party or by which it is bound, involving any obligation for borrowed money, unless such breach or default is cured in accordance with such

agreement, instrument, or document without the counterparty thereto having taken any action to enforce remedies as a result thereof; or

(vii)   one or more final judgments or orders for the payment of money aggregating in excess of $100,000 (or its equivalent in the relevant currency of payment), including any such final order enforcing a binding arbitration decision (to the extent not covered by independent third party insurance as to which the insurer does not dispute coverage), are rendered against the Company and which judgments are not, within 30 days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged or vacated within 30 days after the expiration of such stay.

(b)   Upon the occurrence of an Event of Default, the Lender shall have then, or at any time thereafter, all of the rights and remedies afforded by applicable law or in equity or to which the Lender is entitled under this Note.  Lender shall be entitled to set off all or any portion of the unpaid principal under this Note against any indebtedness owed by the Lender to the Company.

6.   No Set-Off.  All payments by the Company under this Note shall be made without set-off or counterclaim and be without any deduction or withholding for any taxes or fees of any nature, unless the obligation to make such deduction or withholding is imposed by law.

7.   Collection Expenses.  If this Note is not paid in accordance with its terms, or if an Event of Default shall have occurred, the Company shall pay to the Lender, in addition to principal and accrued interest thereon, all costs of collection of this Note, and of protecting, preserving or enforcing the Lender's rights under or in respect of this Note, including but not limited to reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note, whether or not in connection with any Insolvency Event. Amounts due under this Section 7 shall become part of the principal amount hereunder and accrue interest as set forth in Section 1 above.

8.   Waivers.  The Company hereby expressly and irrevocably waives presentment, demand, protest, notice of protest and all other notices in connection with this Note.  No delay or extension on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note, and a waiver of any right on any one occasion shall not operate as a waiver of such right on any future occasion.

9.   General.

(a)   Transfers; Successors and Assigns.  This Note, and the obligations and rights of the Company hereunder, shall be binding upon and inure to the benefit of the Company, the holder of this Note, and their respective heirs, successors and assigns; provided, however, that the Company may not transfer or assign its obligations hereunder, by operation of law or otherwise, without the consent of the Lender, which consent shall not be unreasonably withheld. The Lender may not transfer or assign its rights hereunder, by operation of law or otherwise, without the consent of the Company, which consent shall not be unreasonably withheld; provided that the Lender shall transfer and assign all of its rights hereunder to BOX Digital

-4-

Markets LLC prior to, and as a condition of, Lender's ceasing to be a majority owner of all equity interests in BOX Digital Markets LLC.

        (b)    <u>Changes</u>.  The terms and provisions of this Note may be modified or amended only by a written instrument duly executed by the Company and by the Lender.

        (c)    <u>Notices</u>.  All notices, requests, consents and demands shall be made in writing and shall be mailed postage prepaid, or delivered by hand, to the Company or to the holder hereof at their respective addresses set forth below or to such other address as may be furnished in writing to the other party hereto:

| | |
|---|---|
| If to the Lender: | BOX Holdings Group LLC<br>101 Arch Street, Suite 610<br>Boston, MA<br>Attn: Lisa Ruggiero |
| With a copy to: | George Shuster, Esq.<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>60 State Street<br>Boston, MA 02109 |
| If to the Company: | Boston Security Token Exchange LLC<br>101 Arch Street, Suite 1940<br>Boston, MA  02110<br>Attn: Lisa Fall, CEO |
| With a copy to: | Glen Openshaw, Esq.<br>Acquire Law LLC<br>Ten Post Office Square, South Tower, 8th Floor<br>Boston, MA  02109 |

    10.    <u>Enforceability</u>.  In the event any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, then such provision(s) only shall be deemed null and void and shall not affect any other provision of this Note, and the remaining provisions of this Note shall remain operative and in full force and effect and in no way shall be affected, prejudiced or disturbed thereby.

    11.    <u>Officers and Directors Not Liable</u>.  In no event shall any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

    12.    <u>Governing Law</u>.  This Note and the obligations of the Company hereunder shall be governed by and interpreted and determined in accordance with the laws of the State of New York (excluding the laws and rules of law applicable to conflicts or choice of law).

    13.    <u>Loss of Note</u>.  Upon receipt by the Company of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Note or any Note exchanged for it, and indemnity reasonably satisfactory to the Company (in case of loss, theft or destruction) or surrender and

cancellation of such Note (in the case of mutilation), the Company will make and deliver in lieu of such Note a new Note of like tenor.

14.    <u>Amendment to First Note</u>.    Pursuant to Section 9(b) of the First Note, the Company and the Lender hereby agree to delete Section 4(a) of the First Note in its entirety and replace it with the following:

"<u>Debt</u>. The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 2, dated as of May 5, 2022, issued by the Company to the Lender, (iii) indebtedness under that certain Promissory Note No. 3, dated as of May 16, 2022, issued by the Company to the Lender, (iv) indebtedness under that certain Promissory Note No. 4, dated as of July 28, 2022, issued by the Company to the Lender, and (v) other indebtedness in an aggregate principal amount not to exceed $5,000,000."

15.    <u>Amendment to Second Note</u>.    Pursuant to Section 9(b) of the Second Note, the Company and the Lender hereby agree to delete Section 4(a) of the Second Note in its entirety and replace it with the following:

"<u>Debt</u>. The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 1, dated as of March 10, 2022, issued by the Company to the Lender (the "<u>First Note</u>"), (iii) indebtedness under that certain Promissory Note No. 3, dated as of May 16, 2022, issued by the Company to the Lender, (iv) indebtedness under that certain Promissory Note No. 4, dated as of July 28, 2022, issued by the Company to the Lender, and (v) other indebtedness in an aggregate principal amount not to exceed $5,000,000."

16.    <u>Amendment to Third Note</u>.    Pursuant to Section 9(b) of the Second Note, the Company and the Lender hereby agree to delete Section 4(a) of the Second Note in its entirety and replace it with the following:

"<u>Debt</u>. The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 1, dated as of March 10, 2022, issued by the Company to the Lender (the "<u>First Note</u>"), (iii) indebtedness under that certain Promissory Note No. 2, dated as of May 5, 2022, issued by the Company to the Lender (the "<u>Second Note</u>"), (iv) indebtedness under that certain Promissory Note No. 4, dated as of July 28, 2022, issued by the Company to the Lender, and (v) other indebtedness in an aggregate principal amount not to exceed $5,000,000."

*[Signature on following page]*

- 6 -

IN WITNESS WHEREOF, this Note has been duly executed on behalf of the undersigned on the day and in the year first written above.

Boston Security Token Exchange LLC

By: _____

Name: David M. Battan

Title: Chairman

# EXHIBIT J

EX. J

## BOSTON SECURITY TOKEN EXCHANGE LLC

### Promissory Note

No. 5

$200,000                                    August 30, 2022 (the "Issue Date")

For value received, Boston Security Token Exchange LLC, a Delaware limited liability company (the "Company"), hereby promises to pay to the order of BOX Holdings Group LLC (hereinafter together with successors in title and assigns referred to as the "Lender"), the principal sum of Two Hundred Thousand Dollars ($200,000), or such lesser principal amount as may be outstanding, together with interest from the date hereof on the principal amount outstanding from time to time, as specified below.

1.    Interest.  All principal amounts advanced or otherwise owing under this Note shall bear interest at an annual rate of three percent (3%) calculated based on a 365-day year, provided that upon the occurrence of an Event of Default (as defined below), for so long as such Event of Default is continuing, such amounts shall bear interest at an annual rate of five percent (5%) calculated based on a 365-day year. Interest shall be computed on the basis of the actual number of days elapsed.

2.    Maturity; Payments.  The principal amount outstanding under this Note together with accrued interest (the sum of such principal and accrued interest being hereinafter referred to as the "Outstanding Amount") and any costs and expenses under Section 7 hereof shall be due and payable on the earliest of: (a) December 31, 2022; (b) the first date on which the Company issues and sells, including (without limitation) to any existing equity holder of the Company, in one or more transactions, shares of its capital stock or other equity interests of the Company in one or more bona fide equity financings with aggregate net proceeds sufficient to repay all then existing indebtedness of the Company; and (c) any acceleration in accordance with the terms hereof. Notwithstanding the foregoing, the Company may prepay this Note in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.  No repaid or prepaid amount may be reborrowed.

3.    Representations and Warranties.

(a)    Existence.  The Company is duly formed, validly existing and in good standing under the laws of Delaware.

(b)    Authorization; Execution; Enforceability.  The execution and delivery of this Note, the borrowing hereunder and the performance by the Company of its obligations hereunder are within the organizational power and authority of the Company, have been duly authorized by all necessary organizational action on the part of the Company and do not and will not contravene, conflict with or result in a violation or breach of, as applicable, any provision of the organizational documents of the Company, any material agreement of the Company or any applicable laws. This Note has been duly and validly executed and delivered by the Company and

constitutes the valid and binding agreement of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

   (c) <u>No Approvals</u>.  No consent or authorization of, filing with, notice to or other act by, or in respect of, any governmental authority or any other person is required in order for the Company to execute, deliver, or perform any of its obligations under this Note.

   (d) <u>Indebtedness</u>.  There is no outstanding indebtedness that is secured by any assets of the Company.

   4. <u>Covenants</u>.  The Company covenants and agrees that, until payment in full of all amounts payable under this Note:

   (a) <u>Debt</u>.  The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 1, dated as of March 10, 2022 (the "<u>First Note</u>"), issued by the Company to the Lender, (iii) indebtedness under that certain Promissory Note No. 2, dated as of May 5, 2022 (the "<u>Second Note</u>"), issued by the Company to the Lender, (iv) indebtedness under that certain Promissory Note No. 3, dated as of May 16, 2022 (the "<u>Third Note</u>"), issued by the Company to the Lender, (v) indebtedness under that certain Promissory Note No. 4, dated as of July 28, 2022 (the "<u>Fourth Note</u>"), issued by the Company to the Lender, and (vi) other indebtedness in an aggregate principal amount not to exceed $5,000,000.

   (b) <u>Liens</u>.  The Company shall not, directly or indirectly, create, incur, assume or suffer to exist any security interest or other security arrangement of any kind or nature whatsoever (a "<u>Lien</u>") upon any of its properties or assets whether now owned or hereafter acquired securing any obligations, other than Permitted Liens.  "<u>Permitted Liens</u>" means any (a) Lien imposed by law for taxes not yet due and payable or that are being properly contested by appropriate proceedings and for which adequate reserves have been maintained in accordance with generally accepted accounting principles, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (c) zoning, entitlement, conservation restriction and other land use and environmental regulations promulgated by governmental authorities, (d) any right, interest, lien, title or other encumbrance of a lessor or sublessor under any lease or other similar agreement or in the property being leased, (e) all exceptions, restrictions, easements, imperfections of title, charges, rights-of-way and other encumbrances that do not materially interfere with the present use of the assets of the Company, (f) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance or self-insurance to the Company, (g) Liens securing judgments or orders for the payment of money not constituting an Event of Default under Section 5(a)(vii), and (h) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not interfere

in any material respect with the business of the Company, taken as a whole and leases, licenses, subleases or sublicenses constituting a disposition permitted hereunder.

(c)     Dispositions.  The Company shall not directly or indirectly convey, sell, transfer, lease, assign or otherwise dispose of, or agree to convey, sell, transfer, lease, assign, or otherwise dispose of (whether in one or a series of transactions) (collectively, "Transfer") all or any part of its business or property, except for Transfers: (i) of inventory in the ordinary course of business, (ii) Transfers of used, worn out, obsolete or surplus property in the ordinary course of business and (iii) Transfers of cash and cash equivalents in the ordinary course of business.

(d)     Use of Proceeds.  The Company shall not use the proceeds of this Note to make cash payments to Lisa Fall.

5.     Default.

(a)     This Note shall become immediately due and payable, and all amounts in respect of this Note shall be immediately accelerated, upon notice and demand by the Lender (except in the case of clauses (i) and (ii) below, which events (each an "Insolvency Event") shall not require notice or demand and in respect of which events such acceleration shall be automatic without any notice, demand, or other action of any person or entity), upon the occurrence of any of the following events of default (individually, "an Event of Default" and collectively, "Events of Default"):

(i)     the liquidation, dissolution or insolvency of the Company, the adoption of any liquidation, dissolution, or insolvency resolution or plan by the Company or its directors, or the appointment of a receiver or custodian for the Company of all or substantially all of its property, if, in the case of an appointment that is not consented to and is opposed by the Company, such appointment is not terminated or dismissed within 30 days;

(ii)     the institution by or against the Company of any proceedings under the United States Bankruptcy Code or any other federal or state bankruptcy, reorganization, receivership, assignment for the benefit of creditors, insolvency or other similar law affecting the rights of creditors generally;

(iii)     the breach by the Company of any of its representations, warranties or covenants set forth herein, except in the case of breaches that are curable, in which case the Company shall have thirty (30) days to effect such cure;

(iv)     the sale of all or substantially all of the assets or business of the Company, whether by merger, sale of assets, sale of stock or otherwise;

(v)     the failure of the Company to make any payment of principal or interest when due on this Note;

(vi)     the breach or default under any agreement, instrument or document to which the Company is a party or by which it is bound, involving any obligation for borrowed money, unless such breach or default is cured in accordance with such

agreement, instrument, or document without the counterparty thereto having taken any action to enforce remedies as a result thereof; or

(vii)   one or more final judgments or orders for the payment of money aggregating in excess of $100,000 (or its equivalent in the relevant currency of payment), including any such final order enforcing a binding arbitration decision (to the extent not covered by independent third party insurance as to which the insurer does not dispute coverage), are rendered against the Company and which judgments are not, within 30 days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged or vacated within 30 days after the expiration of such stay.

(b)   Upon the occurrence of an Event of Default, the Lender shall have then, or at any time thereafter, all of the rights and remedies afforded by applicable law or in equity or to which the Lender is entitled under this Note. Lender shall be entitled to set off all or any portion of the unpaid principal under this Note against any indebtedness owed by the Lender to the Company.

6.   <u>No Set-Off</u>. All payments by the Company under this Note shall be made without set-off or counterclaim and be without any deduction or withholding for any taxes or fees of any nature, unless the obligation to make such deduction or withholding is imposed by law.

7.   <u>Collection Expenses</u>. If this Note is not paid in accordance with its terms, or if an Event of Default shall have occurred, the Company shall pay to the Lender, in addition to principal and accrued interest thereon, all costs of collection of this Note, and of protecting, preserving or enforcing the Lender's rights under or in respect of this Note, including but not limited to reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note, whether or not in connection with any Insolvency Event. Amounts due under this Section 7 shall become part of the principal amount hereunder and accrue interest as set forth in Section 1 above.

8.   <u>Waivers</u>. The Company hereby expressly and irrevocably waives presentment, demand, protest, notice of protest and all other notices in connection with this Note. No delay or extension on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note, and a waiver of any right on any one occasion shall not operate as a waiver of such right on any future occasion.

9.   <u>General</u>.

(a)   <u>Transfers; Successors and Assigns</u>. This Note, and the obligations and rights of the Company hereunder, shall be binding upon and inure to the benefit of the Company, the holder of this Note, and their respective heirs, successors and assigns; provided, however, that the Company may not transfer or assign its obligations hereunder, by operation of law or otherwise, without the consent of the Lender, which consent shall not be unreasonably withheld. The Lender may not transfer or assign its rights hereunder, by operation of law or otherwise, without the consent of the Company, which consent shall not be unreasonably withheld; provided that the Lender shall transfer and assign all of its rights hereunder to BOX Digital Markets LLC prior to, and as a condition of, Lender's ceasing to be a majority owner of all equity interests in BOX Digital Markets LLC.

- 4 -

      (b)   <u>Changes</u>.  The terms and provisions of this Note may be modified or amended only by a written instrument duly executed by the Company and by the Lender.

      (c)   <u>Notices</u>.  All notices, requests, consents and demands shall be made in writing and shall be mailed postage prepaid, or delivered by hand, to the Company or to the holder hereof at their respective addresses set forth below or to such other address as may be furnished in writing to the other party hereto:

| If to the Lender: | BOX Holdings Group LLC<br>101 Arch Street, Suite 610<br>Boston, MA<br>Attn: Lisa Ruggiero |
|---|---|
| With a copy to: | George Shuster, Esq.<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>60 State Street<br>Boston, MA 02109 |
| If to the Company: | Boston Security Token Exchange LLC<br>101 Arch Street, Suite 1940<br>Boston, MA  02110<br>Attn: Lisa Fall, CEO |
| With a copy to: | Glen Openshaw, Esq.<br>Acquire Law LLC<br>Ten Post Office Square, South Tower, 8th Floor<br>Boston, MA  02109 |

    10.   <u>Enforceability</u>.  In the event any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, then such provision(s) only shall be deemed null and void and shall not affect any other provision of this Note, and the remaining provisions of this Note shall remain operative and in full force and effect and in no way shall be affected, prejudiced or disturbed thereby.

    11.   <u>Officers and Directors Not Liable</u>.  In no event shall any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

    12.   <u>Governing Law</u>.  This Note and the obligations of the Company hereunder shall be governed by and interpreted and determined in accordance with the laws of the State of New York (excluding the laws and rules of law applicable to conflicts or choice of law).

    13.   <u>Loss of Note</u>.  Upon receipt by the Company of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Note or any Note exchanged for it, and indemnity reasonably satisfactory to the Company (in case of loss, theft or destruction) or surrender and cancellation of such Note (in the case of mutilation), the Company will make and deliver in lieu of such Note a new Note of like tenor.

- 5 -

14.     <u>Amendment to First Note</u>. Pursuant to Section 9(b) of the First Note, the Company and the Lender hereby agree to delete Section 4(a) of the First Note in its entirety and replace it with the following:

"<u>Debt</u>. The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 2, dated as of May 5, 2022, issued by the Company to the Lender, (iii) indebtedness under that certain Promissory Note No. 3, dated as of May 16, 2022, issued by the Company to the Lender, (iv) indebtedness under that certain Promissory Note No. 4, dated as of July 28, 2022, issued by the Company to the Lender, (v) indebtedness under that certain Promissory Note No. 5, dated as of August 30, 2022, issued by the Company to the Lender, and (vi) other indebtedness in an aggregate principal amount not to exceed $5,000,000."

15.     <u>Amendment to Second Note</u>. Pursuant to Section 9(b) of the Second Note, the Company and the Lender hereby agree to delete Section 4(a) of the Second Note in its entirety and replace it with the following:

"<u>Debt</u>. The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 1, dated as of March 10, 2022, issued by the Company to the Lender (the "<u>First Note</u>"), (iii) indebtedness under that certain Promissory Note No. 3, dated as of May 16, 2022, issued by the Company to the Lender, (iv) indebtedness under that certain Promissory Note No. 4, dated as of July 28, 2022, issued by the Company to the Lender, (v) indebtedness under that certain Promissory Note No. 5, dated as of August 30, 2022, issued by the Company to the Lender, and (vi) other indebtedness in an aggregate principal amount not to exceed $5,000,000."

16.     <u>Amendment to Third Note</u>. Pursuant to Section 9(b) of the Third Note, the Company and the Lender hereby agree to delete Section 4(a) of the Third Note in its entirety and replace it with the following:

"<u>Debt</u>. The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 1, dated as of March 10, 2022, issued by the Company to the Lender (the "<u>First Note</u>"), (iii) indebtedness under that certain Promissory Note No. 2, dated as of May 5, 2022, issued by the Company to the Lender (the "<u>Second Note</u>"), (iv) indebtedness under that certain Promissory Note No. 4, dated as of July 28, 2022, issued by the Company to the Lender, (v) indebtedness under that certain Promissory Note No. 5, dated as of August 30, 2022, issued by the Company to the Lender, and (vi) other indebtedness in an aggregate principal amount not to exceed $5,000,000."

17.     <u>Amendment to Fourth Note</u>. Pursuant to Section 9(b) of the Fourth Note, the Company and the Lender hereby agree to delete Section 4(a) of the Fourth Note in its entirety and replace it with the following:

"<u>Debt</u>. The Company shall not incur, create, assume, guarantee or in any way become liable for any indebtedness for borrowed money other than (i) indebtedness under this Note, (ii) indebtedness under that certain Promissory Note No. 1, dated as of March 10, 2022, issued by the Company to the Lender (the "<u>First Note</u>"), (iii) indebtedness under that certain Promissory Note No. 2, dated as of May 5, 2022, issued by the Company to the Lender (the "<u>Second Note</u>"), (iv) indebtedness under that certain Promissory Note No. 3, dated as of May 16, 2022, issued by the Company to the Lender (the "<u>Third Note</u>"), (v) indebtedness under that certain Promissory Note No. 5, dated as of August 30, 2022, issued by the Company to the Lender, and (vi) other indebtedness in an aggregate principal amount not to exceed $5,000,000."

*[Signature on following page]*

IN WITNESS WHEREOF, this Note has been duly executed on behalf of the undersigned on the day and in the year first written above.

Boston Security Token Exchange LLC

By:_____
Name:        David M. Battan
Title:        Executive Chairman

# EXHIBIT K

EX. K



### THE COMMONWEALTH OF MASSACHUSETTS
### OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

October 5, 2023

Elizabeth Alder
Beacon Law Group
100 Cambridge Street, 14th Floor
Boston, MA 02114

RE:    Lisa Fall
       Request for Private Right of Action against David Battan (BSTX)

Dear Attorney Alder:

Thank you for contacting the Office of the Attorney General's Fair Labor Division.

Massachusetts General Laws Chapter 149, § 150, and Chapter 151, §§ 1B and 20 establish a private right of action for employees who believe they are victims of certain violations of the state wage laws.

This letter is to inform you that we are authorizing you to pursue this matter through a private civil lawsuit.  If you elect to sue in civil court, you may bring an action on your own or your clients' behalf, and on behalf of other similarly situated workers.

This office will not pursue an investigation or enforcement at this time.

Sincerely,

Fair Labor Division
Office of the Massachusetts Attorney General
(617) 727-3465

# EXHIBIT L

EX. L



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

October 5, 2023

Elizabeth Alder
Beacon Law Group
100 Cambridge St., 14th Floor
Boston, MA, 02114

RE:     Lisa Fall
        Request for Private Right of Action against Alan Konevsky (BSTX)

Dear Attorney Alder:

Thank you for contacting the Office of the Attorney General's Fair Labor Division.

Massachusetts General Laws Chapter 149, § 150, and Chapter 151, §§ 1B and 20 establish a private right of action for employees who believe they are victims of certain violations of the state wage laws.

This letter is to inform you that we are authorizing you to pursue this matter through a private civil lawsuit.  If you elect to sue in civil court, you may bring an action on your own or your clients' behalf, and on behalf of other similarly situated workers.

This office will not pursue an investigation or enforcement at this time.

Sincerely,

Fair Labor Division
Office of the Massachusetts Attorney General
(617) 727-3465